686 So.2d 431 (1995)
William Thomas KNOTTS
v.
STATE.
CR-92-0462.
Court of Criminal Appeals of Alabama.
June 16, 1995.
*440 Richard Lawrence, Paul Lowery, Montgomery, for Appellant.
Jeff Sessions, Atty. Gen., and Beth Poe, Asst. Atty. Gen., for Appellee.
PATTERSON, Judge.
The grand jury of Montgomery County returned seven separate indictments (CC-91-2531 through CC-91-2537) against the appellant, William Thomas Knotts, on November 8, 1991.[1] In case CC-91-2531, he was charged with and convicted of escape in the third degree and was sentenced to 10 years' imprisonment.[2] In case CC-91-2532, he was charged with and convicted of theft of property in the second degree and was sentenced *441 to 10 years' imprisonment.[3] In case CC-91-2533, he was charged with and convicted of burglary in the third degree and was sentenced to 10 years' imprisonment and was ordered to pay $3,088 restitution.[4] In case CC-91-2534, he was charged with and convicted of theft of property in the first degree and was sentenced to 20 years' imprisonment.[5] In case CC-91-2535, he was charged with and convicted of burglary in the first degree and was sentenced to 20 years' imprisonment.[6] In case CC-91-2536, he was charged with and convicted of theft of property in the second degree and was sentenced to 10 years' imprisonment.[7] In each of these cases, the appellant was also ordered to pay $150 to the victims compensation fund, court costs, and attorney fees. All of the above sentences were to be served consecutively.
In case CC-91-2537, the appellant was charged in a two-count indictment with capital murder. Count I charged murder committed during a robbery in the first degree, a violation of Ala.Code 1975, ง 13A-5-40(a)(2), and Count II charged murder committed during a burglary in the first degree, a violation of ง 13A-5-40(a)(4).[8]
At arraignment, the appellant entered pleas of not guilty and not guilty by reason of mental disease or defect. He subsequently withdrew his plea of not guilty by reason of mental disease or defect. The jury verdict on the two-count capital indictment reads, "We, the jury, find the defendant guilty of capital murder." In reference to the convictions for the capital offenses, a sentencing hearing was held before the jury, in accordance with งง 13A-5-45 and -46, and the jury recommended that the sentence be life *442 imprisonment without the possibility of parole, by a vote of nine to three.[9] Thereafter, the trial court held another sentencing hearing in accordance with งง 13A-5-47 through -52, and, after weighing the aggravating and mitigating circumstances and considering the presentence report and the jury's recommendation, sentenced the appellant to death. "While the jury's recommendation concerning sentence shall be given consideration, it is not binding upon the court." ง 13A-5-47(e).
In October 1989, the appellant was in the custody of the Department of Youth Services at its detention facility at Mt. Meigs in Montgomery County, having been adjudicated a delinquent by the juvenile court of Jefferson County. Sometime in early October, he and a fellow inmate, M.C., escaped from the facility and, for approximately 24 hours, wandered around in the fields and on the roads nearby. According to the appellant's subsequent statement, while he and his companion were sitting in a field near the residence of Helen Rhodes, she yelled in their direction and called them names such as "cracker" and "honky." They decided to leave the field and, a short distance away, they stopped on a bridge. While they were sitting on the bridge, Helen Rhodes drove by at a high rate of speed and splashed water on them from a pothole on the bridge. M.C. fell from the bridge into the water. This made the appellant mad, and he wanted to "get back at her." They eventually turned themselves in and were returned to the detention facility.
About two weeks later, on October 17, 1989, the appellant escaped again. He hid in the shop bathroom until the shop was closed, left a note that he was going to Dothan, took a screwdriver, a jacket, and a pair of gloves from the shop, and left after dark. He took the screwdriver because he intended to use it to steal an automobile. It began to rain, and he decided to return to the shop. He took a bicycle belonging to Delbert Parker from Parker's yard and rode back to the facility. He hid in the shop until around 4:00 a.m., when he left again, riding the bicycle in the direction of the residence of Helen Rhodes, who he remembered had splashed water on him when she was driving by in her automobile. Between 8:30 and 11:30 a.m., he broke into the house of Carrie Ware by removing the screen from the kitchen window, and stole a .22 caliber pistol, a sweater, a Seiko brand wrist watch, credit cards, and other items. According to the appellant's subsequent statement, he took the pistol to "scare somebody out of their car or something." He left the Ware house, crossed the street, broke into the home of Sheila Rhodes, by breaking out a rear window, and stole a .38 caliber derringer, a .38 caliber Smith and Wesson pistol, a .22 caliber pistol, over 500 rounds of ammunition for the pistols, food, a tin can containing approximately $60 in coins, a black leather bag, and clothing. He then went into the woods where he counted the money and made plans to "get the lady ... for what she did." He then went to Helen Rhodes's house, which he entered by punching a hole in the screen and unlocking a door. He put his wet shoes in a clothes dryer, watched television, hid in the washroom, and waited for Helen Rhodes to return home. While waiting, he composed a note, which he subsequently left on the mantle. He intended for the note to mislead law enforcement officers into thinking that the crimes he was committing were gang related.
Between 6:00 and 6:30 p.m., Helen Rhodes arrived home with her two-year-old son. Shortly after she and the child entered the house, she walked past the appellant's hiding place and he shot her. The bullet passed through her arm and shattered the sliding glass door. Helen Rhodes sat down on a sofa. Her child ran into the room hollering and crying. She got up, apparently to go to her child, and fell. The appellant then shot her in the back. This shot pierced her aorta and her lungs, ultimately causing her death. She remained conscious for 30 to 60 seconds. There was evidence at the scene that a third shot was fired: a .38 caliber bullet was recovered from the kitchen wall about two feet *443 from the floor. The appellant, fearing that someone may have heard the shots, gathered together the items he had taken in the previous burglaries, along with Helen Rhodes's purse, her husband's shoes, and a travel kit, and drove away toward Birmingham in her late model Toyota automobile. Her husband returned home between 10:30 and 11:00 p.m., and discovered his wife's body and his son, whose clothing was soaked with his mother's blood, sitting beside her body, crying.
Shortly thereafter, a pickup order or "BOLO" for the appellant was broadcast statewide. Around 3:15 a.m. the following morning, the appellant was discovered by the police, who were aware of the BOLO, sleeping in the victim's automobile[10] in a parking lot in Birmingham, and they arrested him. At the time of his arrest, he was wearing the sweater he had taken from the Ware residence, and Ware's Seiko watch was attached to a belt loop of his pants. A search of the automobile revealed four pistols, the three taken from Sheila Rhodes's residence and one taken from the Ware's residence. After his arrest and after being advised of his rights pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and Ala.R.Juv.P. 11(B), he told Officer Julie Loebler of the Birmingham Police Department that he had killed a woman because she had called him names; that he had escaped from the juvenile detention center at Mt. Meigs; that he had broken into a house and had stolen four guns and ammunition; that he waited on Helen Rhodes to come home and, that when she did, he fired two shots, killing her; and that he had written the note left on the victim's mantle. Later that day, the appellant was returned to Montgomery, where he made a statement admitting to escaping from the juvenile facility, stealing the bicycle belonging to Parker, burglarizing the residences of Ware, Sheila Rhodes, and Helen Rhodes, taking the guns and other items from the residences, killing Helen Rhodes, and taking her automobile. He stated that he had waited approximately an hour and a half in Helen Rhodes's home for her to come home so he could shoot her for splashing water on him. The statement was videotaped. The tape and a transcript of the statement were admitted into evidence, and we have reviewed them. The appellant did not testify at either the guilt phase or the sentencing phase of the trial and offered evidence only at the sentencing phase. At the sentencing phase, the appellant introduced extensive evidence concerning his family and his social, psychological, and educational background in an effort to show statutory and nonstatutory mitigating circumstances. The appellant does not question the evidence presented by the state. He, in effect, admits that the events established by the evidence occurred. While he admits to murdering Helen Rhodes, he contends that the facts do not support convictions for capital murder. His counsel stated in closing argument, "[I]t's not a question whether a murder was committed, but there is a question of whether it's a capital murder, a murder in which death should be considered." In reference to the capital charges, he asked the jury to return a verdict of murder, not capital murder.
The appellant raises numerous issues on appeal. We will address them in the order in which they appear in the appellant's brief.

I.
The appellant contends that the trial court erred in refusing to admit into evidence certain court, hospital, social service, and mental health records during the sentencing phase of the trial. He argues that these records supply crucial mitigating evidence about the appellant's "abusive and deprived" family background. He specifically refers to Trussville Police Department records concerning an assault on the appellant's sister by the appellant's father in April 1984, when the appellant was 12 years of age; a police report on the arrest of the appellant's father for child abuse for allegedly beating the appellant's sister in September 1984; hospital records for treatment of the appellant's sister for injuries allegedly resulting from actions *444 of the appellant's father in April and September 1984; Salvation Army group home records concerning the appellant's sister and their family during her five-week stay in the home in September and October 1984; Eastside Mental Health Center records regarding psychological counseling provided the family during a one-year period beginning in 1985 and ending in 1986; and Alabama Department of Human Resources records pertaining to the appellant's sister and the family during most of 1984.
A sentencer in a capital case may not refuse to consider or be "precluded from considering" mitigating factors. Eddings v. Oklahoma, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982) (quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978)). The capital defendant generally must be allowed to introduce any relevant mitigating evidence regarding the defendant's character or record or any of the circumstances of the offense, and consideration of such evidence is a constitutionally indispensable part of the process of inflicting the penalty of death. Ex parte Henderson, 616 So.2d 348 (Ala.1992); Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993); California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987).
The records in question were offered in evidence by the appellant to show his home life and the fact that he was a product of a dysfunctional family. The state objected to the evidence on grounds of relevancy. The trial court sustained the state's objections and stated that all the records pertaining to the appellant would be admitted, but that the records pertaining to persons other than the appellant would not. The determination of the relevancy of evidence lies within the sound discretion of the trial court. Borden v. State, 522 So.2d 333 (Ala.Cr.App.1988); C. Gamble, McElroy's Alabama Evidence, ง 21.01(6) (4th ed. 1991). Here, the trial court was required to admit all relevant mitigating evidence of the appellant's character or record and any circumstances pertaining to the offenses. The question before us is whether the trial court abused its discretion in refusing to admit evidence pertaining to members of the appellant's family. We find that although the offered evidence may have had some slight probative value, the trial court did not abuse its discretion in refusing to allow its admission under the facts and circumstances existing here. The trial court admitted all records offered for purposes of mitigation pertaining specifically to the appellant.
Furthermore, even if the trial court's ruling was erroneous, we do not believe the error injuriously affected the substantial rights of this appellant. Matters in the excluded records pertaining to the appellant's home and family were admitted in evidence through other records and through the testimony of numerous witnesses, thus making the evidence in the excluded records cumulative. The appellant's sister testified at the sentencing hearing about the home and family life of the appellant. Thus, if error occurred, at all, it was harmless. See Ala. R.App.P. 45; McMahon v. State, 560 So.2d 1094 (Ala.Cr.App.1989).

II.
The appellant contends that in rejecting the jury's recommendation of life imprisonment without parole, the trial court improperly refused to consider the appellant's lack of a criminal record, his full confession and cooperation with the police, his history of abusing drugs and alcohol, his expressions of remorse to the victim's husband, his compassion and caring for his family, his kindness to others, his lack of a history of violent conduct, his writing ability, and his "physically and emotionally abusive childhood." He contends that because the trial court allegedly refused to consider the factors and find them to be mitigating circumstances, he is entitled to a new sentencing hearing before the trial court where the allegedly mitigating circumstances will be properly considered and weighed.
The record shows that the trial court considered all matters in mitigation offered by the appellant except those that were explicitly not admitted on grounds of relevancy. The court allowed evidence to be admitted bearing on all of the alleged mitigating circumstances *445 listed above. The court found the existence of two statutory mitigating circumstances: that the appellant had no significant history of prior criminal activity, and that the age of the appellant at the time of the commission of the crime was 17 years and 11 months. ง 13A-5-51(1) and (7). The court found the existence of three nonstatutory mitigating circumstances, i.e., that the appellant had been the product of a dysfunctional family, that he suffered behavioral and emotional problems, and that he entered the juvenile system as a runaway from a dysfunctional family situation.
More particularly, the appellant contends that he is entitled to a new sentencing hearing before the trial court at which the statutory mitigating circumstance of lack of a significant criminal history could be properly considered and weighed. He argues that the trial court, in overruling the jury's recommendation and sentencing him to death, erred in relying on his juvenile record as a basis for refusing to find and weigh the statutory mitigating factor. We find no merit to this contention. While the trial court stated in its original sentencing order that it did not find as a mitigating factor the lack of a significant criminal history, this obvious error was corrected by the trial court in its amended sentencing order. In that latter order, the trial court found that "[t]he defendant has no significant history of prior criminal activity," and weighed that circumstance and the other mitigating circumstances it found to exist against the aggravating circumstances in deciding to override the jury's recommendation.
The appellant further contends, however, that we should review the original sentencing order and not the amended order, which he refers to as a "sanitized" order. He argues that the amended order was drafted by the state and was designed to conceal from appellate review the mistaken finding on mitigation in the first order. We do not agree. A comparison of the sentencing orders in the light of the record shows that the original order was amended by the trial court, at the suggestion of the state, to correct clerical mistakes and errors committed through oversight or omission. Corrections of this kind are authorized by Ala.R.Cr.P. 29 [11] and may be made by the trial court during the pendency of an appeal.
The only substantive change in the amended order regards the finding concerning the statutory mitigating circumstance of no significant prior criminal record. Obviously the lack of such a finding in the original order was an unintentional mistake, and was properly corrected in the amended order. The record shows that the trial court stated at the charge conference that it would charge the jury that it could consider the mitigating circumstance that the appellant had no significant prior criminal record, and the court charged the jury accordingly. In addition to charging the jury that it could consider this statutory mitigating circumstance, it charged it that it could not consider any juvenile record of the appellant in determining whether such mitigating circumstance existed. It is highly unlikely that the trial court would inform the jury that it could not consider the appellant's juvenile record in determining whether he had a prior criminal record and then find, itself, that the appellant had a prior criminal record that could have been based upon only a juvenile record.
The appellant further contends that it was improper for the trial court to adopt the state's proposed findings and conclusions verbatim. After reviewing the record in this case, we find no reason to doubt that the sentencing order represents the trial court's independent judgment and its considered conclusions. Even when the trial court adopts proposed findings verbatim, the findings are those of the court and its judgment based on those findings may be reversed only if clearly erroneous. Hubbard v. State, 584 So.2d 895 (Ala.Cr.App.1991), cert. denied, 502 U.S. 1041, 112 S.Ct. 896, 116 L.Ed.2d 798 (1992). Here, they are not clearly erroneous.
*446 The appellant also contends that the trial court erred in refusing to consider or in ignoring certain matters that he asserts are mitigating circumstances, i.e., his cooperation with the police to the extent that he gave two confessions, did not resist arrest, and submitted to gun residue and blood tests; his history of drug and alcohol abuse; his remorse for the victim's family as shown by his letter to the victim's husband; and the other alleged nonstatutory mitigating circumstances set out above. We find no merit to these contentions. The record shows that the trial court did consider the evidence offered by the appellant pertaining to these alleged mitigating circumstances. Although consideration of all mitigating circumstances is required of the trial court, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer. Carroll v. State, 599 So.2d 1253 (Ala.Cr. App.1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994). See also Ex parte Harrell, 470 S.2d 1309, 1318 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985) ("While Harrell's alleged remorse and apparent cooperation possibly could have been considered as non-statutory mitigating circumstances, pursuant to Code 1975, ง 13A-5-52, whether to consider them as such was within the discretion of the trial judge.").

III.
The appellant contends that the trial court erred in overriding the jury's sentence recommendation by using an allegedly incorrect and overbroad legal standard to determine the existence of the aggravating circumstance that the capital offenses were especially heinous, atrocious, or cruel when compared to other capital offenses; that the evidence does not support a finding that the capital offenses were especially heinous, atrocious, or cruel; and that the trial court erred in denying his pretrial motion to require the state to give notice of the aggravating circumstances on which it intended to rely in seeking the death penalty. He argues that because of these errors he is entitled to a new sentencing hearing before the trial court.
The aggravating circumstance under consideration here is set out in ง 13A-5-49(8): "The capital offense was especially heinous, atrocious, or cruel compared to other capital offenses." In comparing capital offenses for the purpose of determining whether a particular capital offense was "especially heinous, atrocious, or cruel," we adhere to the standard announced in Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981): the particular offense must be one of those "conscienceless or pitiless homicides which are unnecessarily torturous to the victim."
In the instant case, the trial court correctly instructed the jury on the meaning of the aggravating circumstance set out in ง 13A-5-49(8), in accordance with the Kyzer standard, as follows:
"Of the list of aggravating circumstances provided by law, there are two circumstances which you may consider in this case, if you are convinced beyond a reasonable doubt and to a moral certainty based on the evidence that such circumstances do exist. The aggravating circumstances which you may consider in this case are: the capital offense was committed while the defendant was engaged in a robbery or burglary; and two, the capital offense was especially heinous, atrocious or cruel compared to other capital offenses.
"The term `heinous' means extremely wicked or shockingly evil. The term `atrocious' means outrageously wicked and violent. The term `cruel' means designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering of others.
"What is intended to be included in this aggravating circumstance [are] only those cases where the actual commission of the capital offense is accompanied by such additional acts as to set the crime apart from the norm of capital offenses.
"For a capital offense to be especially heinous or atrocious or cruel, it must be a consciousless [sic] or pitiless crime which is unnecessarily tortuous to the victim. All capital offenses are heinous, atrocious and cruel to some extent, but not all capital *447 cases are especially heinous, atrocious or cruel compared to other capital offenses.
"You should not find or consider this aggravating circumstance unless you find that this particular capital offense involved a consciousless [sic] or pitiless crime which was unnecessarily tortuous to the victim."
In determining the sentence to impose pursuant to ง 13A-5-47, the trial court found the existence of the aggravating circumstance that the capital offenses were especially heinous, atrocious, or cruel when compared to other capital offenses. The trial court's findings concerning the existence of this aggravating circumstance are:
"The capital offense was especially heinous, atrocious or cruel when compared to other capital crimes, Alabama Code, 1975, Section 13A-5-49(8). The State's evidence proved the existence of this aggravating circumstance beyond a reasonable doubt. The State's evidence revealed the following:
"A. Knotts constantly thought over a period of approximately two weeks and planned this murder which was motivated by revenge, because he was mad at Mrs. Rhodes for what he thought was her intentionally splashing water on him.
"B. Knotts waited no less than two hours for Mrs. Rhodes to return home so that he could carry out his plan.
"C. Knotts deliberately sat at Mrs. Rhodes' home and took no opportunity to leave, both before and after Mrs. Rhodes's arrival at her home.
". . . .
"E. Mrs. Rhodes suffered extreme physical pain, mental anguish and emotional trauma from the time she was first shot.
". . . .
"G. Mrs. Rhodes' baby, Darius, witnessed her murder. It is reasonable to believe she experienced horror and terror prior to her death, fearful for the safety of her son, Darius, who was hollering and screaming for his mother.
"H. While Mrs. Rhodes lay helpless and defenseless on the floor, Knotts consciously shot her a second time in the back leaving her to die. This was the fatal wound, and according to the forensic pathologist, Mrs. Rhodes remained conscious for at least thirty (30) to sixty (60) seconds after this shot."[12]

A.
We find no merit in the appellant's contention that the trial court applied an incorrect standard in determining the existence of the aggravating circumstance that the capital offenses were especially heinous, atrocious, or cruel when compared to other capital offenses. The trial court's findings, along with its instructions to the jury with regard to this aggravating circumstance, reflect a correct understanding of the aggravating circumstance and the application of the law relating to it. It is apparent that the trial court, in weighing the evidence presented, was guided by the standard established in Kyzer.

B.
We find no merit in the appellant's contention that the evidence was insufficient to find the existence of this aggravating circumstance. The appellant argues, in substance, that he dispatched the victim quickly, without unnecessary suffering, and that, therefore, the offenses were not "conscienceless or pitiless" and "unnecessarily torturous *448 to the victim" as required by the Kyzer standard. We do not agree. There was sufficient evidence to support the trial court's finding of the existence of the aggravating circumstance. After being shot in her arm, the victim, who was apparently stunned, sat down on her couch and faced her killer. It is reasonable to conclude from the evidence that she was concerned about her child who had run into the room screaming at the sound of the shot; that she made an effort to go to her child and was shot in the back as she fell; and that the victim was aware of a third shot, which we conclude must have been fired almost immediately after the appellant's shooting the victim twice because of his admittedly hasty flight and that she could have believed had been fired in the direction of her child. The medical testimony shows that she was conscious between 30 seconds and a minute after she was shot in her back. One can only imagine the terror that she experienced from the time she was first shot until she lost consciousness.
We concur in the trial court's findings that the evidence established this aggravating circumstance beyond a reasonable doubt. The conduct of the appellant, which we have described above, was conscienceless, pitiless, and unnecessarily torturous to the victim. We have weighed the evidence and find that it satisfies the requirements of Kyzer. See Hubbard v. State, 500 So.2d 1204 (Ala.Cr. App.), aff'd, 500 So.2d 1231 (Ala.1986), cert. denied, 480 U.S. 940, 107 S.Ct. 1591, 94 L.Ed.2d 780 (1987).

C.
We find no merit in the appellant's contention that the trial court erred in denying his pretrial motion seeking to require the state to give advance notice of the aggravating circumstances upon which it intended to rely in the sentencing phase of the trial. He argues that he did not know, until the state's opening statement to the jury in the penalty phase, that the state intended to rely on the aggravating circumstance that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses. He states that this lack of notice prevented him from properly cross-examining the state's pathologist during the guilt phase and from obtaining his own expert pathologist to rebut the state's witness.
The aggravating circumstances enumerated in ง 13A-5-49 that may lead to the imposition of the death penalty in a capital case are not an element of the offense and are not required to be set forth in the indictment. Dobard v. State, 435 So.2d 1338, 1347 (Ala.Cr.App.1982), aff'd, 435 So.2d 1351 (Ala. 1983), cert. denied, 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984). A defendant has no right to advance notice of the state's intention to rely on any of the aggravating circumstances enumerated in ง 13A-5-49. As authority for this holding, we find persuasive those cases interpreting the Florida statutes because Alabama's death penalty statute is based on Florida's sentencing scheme. See Jacobs v. State, 361 So.2d 607, 633 (Ala. Cr.App.1977), aff'd, 361 So.2d 640 (Ala.1978), cert. denied, 439 U.S. 1122, 99 S.Ct. 1034, 59 L.Ed.2d 83 (1979) ("[t]he aggravating and mitigating circumstances contained in Alabama's new Death Penalty Act are identical to those in the Florida Act"). The Florida courts have addressed the issue of whether a defendant has a right to notice, before trial, of the aggravating circumstances upon which the state intends to rely.
"It is well established under Florida law that a defendant has no right to advance notice of the aggravating circumstances on which the State will rely. Ruffin v. State, 397 So.2d 277, 282 (Fla.), cert. denied, 454 U.S. 882 [102 S.Ct. 368, 70 L.Ed.2d 194]... (1981); Menendez v. State, 368 So.2d 1278, 1282 n. 21 (Fla.1979). The Florida sentencing statute itself sufficiently particularized the aggravating circumstances in a capital case, listing eight specific factors."
Clark v. Dugger, 834 F.2d 1561, 1566 (11th Cir.1987), cert. denied, 485 U.S. 982, 108 S.Ct. 1282, 99 L.Ed.2d 493 (1988); Andrews v. Shulsen, 802 F.2d 1256, 1263 n. 4 (10th Cir.1986), cert. denied, 485 U.S. 919, 108 S.Ct. 1091, 99 L.Ed.2d 253 (1988); Spinkellink v. Wainwright, 578 F.2d 582, 608 (5th Cir.1978), cert. denied, 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979). See also Hitchcock v. State, 413 So.2d 741, 746 (Fla.), cert. *449 denied, 459 U.S. 960, 103 S.Ct. 274, 74 L.Ed.2d 213 (1982). (Because the statutory language limits aggravating circumstances to those set out in the statute, there is no reason to require the state to notify the defendant of the aggravating circumstances that the state intends to prove).
Like Florida's statute, the list of aggravating circumstances in ง 13A-5-49 is exclusive and puts the defendant charged with a capital felony on notice of those circumstances against which he may be required to defend. This statutory notice satisfies constitutional requirements. Furthermore, we observe, as did the court in State v. Osborn, 102 Idaho 405, 413, 631 P.2d 187, 195 (1981), the following:
"Generally, it is apparent that there will be no surprise under the facts of any given case as to what potential aggravating circumstances are involved. Both defense counsel and prosecution who have participated in the earlier preliminary hearing and trial will ordinarily be well appraised and conversant with the facts and issues involved in the aggravation-mitigation hearing."
Clearly, under the facts of this case, it came as no surprise that the state intended to rely upon the aggravating circumstance that the capital offenses were especially heinous, atrocious, or cruel when compared to other capital offenses. We note that the appellant did not seek a recess or a continuance and that he did not request that the state pathologist be recalled for further cross-examination. Accordingly, we find that the trial court's denial of his pretrial motion was not error.

IV.

A.
The appellant contends that in overiding the jury's recommendation of life imprisonment without the possibility of parole, the trial court erred in considering a psychological report pertaining to the appellant prepared by employees of the Taylor-Hardin Secure Mental Health Facility. We find no merit in this contention.
The appellant filed a pretrial motion requesting funds to employ a psychologist as a defense expert. He stated in the motion that he had been diagnosed in 1987 as suffering from a possible manic-depressive type personality disorder. Instead of granting the motion, the trial court ordered that the appellant be examined at the state facility. The appellant objected to an evaluation at the state facility on the basis that such a "compelled" evaluation violated his constitutional rights. He concedes that the trial court was authorized to have him examined to determine if he was competent to stand trial; however, he contends that the court had no authority to have him examined to determine his mental condition both past and present as it related to the offenses charged. After the examination, a report was filed with the trial court. This report, which is in the record on appeal, covered the appellant's mental condition, past and present, and referred to him as being manipulative, unpredictably violent, resistant to rehabilitation, and likely to engage in criminal activity in the future. As we have heretofore noted, the appellant withdrew his insanity defense before trial and did not present any expert psychological testimony at any phase of the proceedings.
There is no indication in the record to support the appellant's contention that the trial court considered the report in deciding to override the jury's recommendation. The report was never introduced or referred to during the trial, and it was not mentioned in the presentence report nor in the trial court's sentencing order. The only reasonable conclusion to be drawn is that the trial court did not consider the report.

B.
The appellant contends that the trial court improperly considered its views on public policy in overriding the jury's recommendation. He argues that in weighing the aggravating and mitigating circumstances, the trial court erroneously concluded that the sentence should be death, based on its own personal views on public policy and the intent of the legislature in adopting the Alabama Death Penalty Act rather than on its adherence to a strict weighing or balancing of the aggravating and mitigating circumstances. *450 He further argues that the trial court's reliance on its personal views, as stated in its findings, indicates that it overrode the jury's recommendation by applying a "presumption in favor of the death penalty" simply because aggravating circumstances existed or because the killing was "deliberately planned, consciously done, and torturously consummated" and ignored or failed to give genuine weight to the mitigating circumstances offered by the appellant.
The portion of the trial court's sentencing order complained of is as follows:
"The Court feels that public policy is served, and society is better protected, regardless of the mitigating circumstances found, by the imposition of the sentence of death in situations such as this when the killing is deliberately planned, consciously done, and torturously consummated. The Court believes that this is a primary reason for the adoptions by our legislature of the aggravating circumstances located in Alabama Code, 1975, Section 13A-5-49(4) and (8)."
After reviewing the trial court's sentencing order and considering it in its entirety, we conclude, contrary to the assertions of the appellant, that the trial court considered the mitigating circumstances and properly weighed the aggravating and mitigating circumstances in arriving at its decision to sentence the appellant to death. It is clear that the trial court understood the sentencing statutes and properly applied them. We do not agree with the appellant's assertion that the trial court applied a "presumption in favor of the death penalty." The sentencing order shows otherwise. Although the trial court expressed its views on what it considered to be matters of public policy, a full reading of the order and findings shows that it did not consider or rely on those views in reaching its decision to override the jury's recommendation and impose the death sentence.

C.
The appellant contends that the trial court erred in considering the victim impact evidence in overriding the jury's recommendation when the appellant had no opportunity to rebut or respond to it. We find no merit in this contention. This evidence consisted of several statements from members of the victim's family describing the physical and psychological effects the victim's death had on members of her family; these statements were introduced at the sentencing phase before the trial court as a part of the presentence report. For several days before their introduction, the appellant was aware of the statements and of the fact that they were being used to prepare the presentence report. He had ample time to raise objections to the statements or to offer evidence in rebuttal.

D.
The appellant contends that, at the sentencing hearing before the trial court, the trial court erred in allowing the prosecutor to elicit on cross-examination testimony relating to misbehavior by the appellant when he was a juvenile confined to institutional group residences. He argues that it was improper for the trial court to consider this testimony in deciding to override the jury's recommendation because the court considered it as a nonstatutory aggravating circumstance. He relies on Bush v. State, 523 So.2d 538 (Ala. Cr.App.1988), which provides that a sentencer in a capital case may not find and consider any aggravating circumstances other than the eight specified in ง 13A-5-49. We find no merit in this contention.
The cross-examination was in response to questions asked on direct examination by the defense that were intended to show that the appellant exhibited traits of good character, that he could be rehabilitated, and that he should be sentenced to life imprisonment without the possibility of parole. The testimony elicited on cross-examination was relevant in that it aided the trial court in determining the weight to be given the mitigating circumstances offered by the appellant and, after reviewing the record and particularly after reviewing the sentencing order, we conclude that the trial court considered the testimony in that light and did not consider it as an aggravating circumstance.

*451 V.
The appellant contends that ง 13A-5-47(e), which provides that a trial court is not bound by a jury's sentencing recommendation in a capital case, is unconstitutional on its face. He argues that it does not contain adequate standards or safeguards to guide the trial court in exercising its authority to override the recommendation of the jury. He also contends that it was unconstitutionally applied in this case because the trial court's action in overriding the jury's recommendation was without standards and fundamentally unfair.
The appellant's contention that the override provision of ง 13A-5-47(e) is facially unconstitutional is without merit. The United States Supreme Court, as well as the courts of this state, has consistently upheld the validity of the judicial override of advisory jury verdicts. See, e.g., Harris v. Alabama, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995); Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990); Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1986); Ex parte Jones, 456 So.2d 380 (Ala.1984), cert. denied, 470 U.S. 1062, 105 S.Ct. 1779, 84 L.Ed.2d 838 (1985); Freeman v. State, 555 So.2d 196 (Ala.Cr.App.1988), aff'd, 555 So.2d 215 (Ala.1989), cert. denied, 496 U.S. 912, 110 S.Ct. 2604, 110 L.Ed.2d 284 (1990). In this state, the recommendation of the jury is advisory only and is not binding upon the trial court. Ex parte Jones. The trial court, not the jury, is the sentencing authority. Freeman v. State.
Section 13A-5-47(e) provides:
"In deciding upon the sentence, the trial court shall determine whether the aggravating circumstances it finds to exist outweigh the mitigating circumstances it finds to exist, and in doing so the trial court shall consider the recommendation of the jury contained in its advisory verdict, unless such a verdict has been waived pursuant to section 13A-5-46(a) or 13A-5-46(g). While the jury's recommendation concerning sentence shall be given consideration, it is not binding upon the court."
This provision prescribes the following standard of review for jury override, which standard meets constitutional requirements: "The whole catalog of aggravating circumstances must outweigh mitigating circumstances before a trial court may opt to impose the death penalty by overriding the jury's recommendation." Ex parte Jones, 456 So.2d at 382. The appellant's statement in his brief to this court that the Alabama Death Penalty Act permits a trial court to impose a death sentence without any guidelines for weighing and considering the jury's decision is not true and ignores the override provision.
The appellant seems to argue that we should follow the Florida standard for jury override prescribed in Tedder v. State, 322 So.2d 908 (Fla.1975). Tedder provides that in order for a trial court to reject a jury's recommendation of a sentence of life imprisonment without parole, "the facts suggesting a sentence of death [must be] so clear and convincing that virtually no reasonable person could differ." Id. at 910. The Tedder standard is not constitutionally mandated, Harris v. Alabama; Ex parte Jones, and we have chosen not to read the Tedder standard into our death penalty statute.
What we do require is that, before determining the sentence, the trial court consider and weigh the advisory verdict of the jury; consider and weigh the presentence investigation report; hear arguments on aggravating and mitigating circumstances; consider and weigh the mitigating and aggravating circumstances; make specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in ง 13A-5-49, each mitigating circumstance enumerated in ง 13A-5-51, and any additional mitigating circumstance offered pursuant to ง 13A-5-52; determine that the aggravating circumstances outweigh the mitigating circumstances; consider all the available evidence; and enter written findings of fact summarizing the crime and the defendant's participation in it. We believe that this scheme adequately channels the trial court's discretion so as to prevent arbitrary results. The Eighth Amendment does not require the state to define the weight the sentencing judge must accord an advisory verdict. Harris v. Alabama.

*452 "[T]he sentencing authority in Alabama, the trial judge, has unlimited discretion to consider any perceived mitigating circumstances, and he can assign appropriate weight to particular mitigating circumstances. The United States Constitution does not require that specific weights be assigned to different aggravating and mitigating circumstances. Murry v. State, 455 So.2d 53 (Ala.Cr.App.1984), rev'd on other grounds, 455 So.2d 72 (Ala.1984). Therefore, the trial judge is free to consider each case individually and determine whether a particular aggravating circumstance outweighs the mitigating circumstances or vice versa. Moore v. Balkcom, 716 F.2d 1511 (11th Cir.1983). The determination of whether the aggravating circumstances outweigh the mitigating circumstances is not a numerical one, but instead involves the gravity of the aggravation as compared to the mitigation."
Clisby v. State, 456 So.2d 99, 102 (Ala.Cr. App.1983). We are convinced, after reviewing the record in this case, that the trial court complied with the sentencing scheme of Alabama's death penalty statute and that the sentence that it imposed, overriding the jury's verdict, met constitutional requirements and was not fundamentally unfair as alleged by the appellant.
The appellant also contends that he is entitled to a new sentencing hearing before a different judge because he believes that the trial judge was "not suitably impartial." He claims that the trial court displayed hostility and appeared biased toward him, his attorneys, and the evidence and legal claims he presented, particularly during the sentencing phase of the trial. He complains that the trial court displayed "unseemly haste" in its efforts to conclude the trial, and "constantly" warned counsel against any action that would delay the proceedings.
No objections were raised in the trial court on these alleged errors. Therefore, we must review them under the "plain error" standard prescribed by Ala.R.App.P. 45A. This rule requires that we notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate action whenever such error has or probably has adversely affected the substantial rights of the appellant. The Alabama Supreme Court has adopted federal case law defining plain error, holding that "`"[p]lain error" only arises if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.'" Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983) (quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir.1981)).
We find no merit to these contentions. While the trial court did on occasion urge the parties to move along with the trial, this was done outside the presence of the jury and was directed toward the state as well as the appellant. These actions by the trial court were fully within its discretion in presiding over the trial. The trial court made it clear on a number of occasions that the appellant would be accorded all the time needed to fully present his case. The trial court's efforts to avoid delays in the trial did not prejudice the appellant. The record does not show any instance where the appellant or his counsel was prevented or hindered by the trial court in fully presenting the appellant's case. The record does not support the charges that the trial court was biased, that it displayed hostility toward the appellant, or that it was partial. We find no error, much less plain error.

VI.
The appellant contends that the sentence of death in his case is excessive and disproportionate, considering his age, his lack of prior criminal record, his cooperation with the police, the effect of his abuse of hallucinogenic drugs, and the abuse and neglect he suffered as a child. He argues that his death sentence is disproportionate considering him and the crimes that he committed and that the mitigating circumstances outweigh the aggravating circumstances in his case, requiring a sentence of life imprisonment without the benefit of parole. He compares his case to other capital cases involving young defendants where the death penalty was not imposed and to others where the death penalty *453 was set aside as being disproportionate. He, in effect, urges us, in carrying out our constitutionally mandated responsibility to review the propriety of the death sentence in accordance with ง 13A-5-53, to find his sentence to be inappropriate, and to remand his case to the trial court with the instruction that he be sentenced to life imprisonment without parole. See Floyd v. State, 486 So.2d 1309, 1315 (Ala.Cr.App.1984), aff'd, 486 So.2d 1321 (Ala.1986), cert. denied, 479 U.S. 1101, 107 S.Ct. 1328, 94 L.Ed.2d 179 (1987).
We do not agree with the appellant's contentions. We concur in the trial court's judgment that death is the appropriate sentence in this case, that it is strongly supported by the evidence, that the aggravating circumstances outweigh the mitigating circumstances, and that it is not excessive or disproportionate to the penalties imposed in similar cases. For further discussion of our independent review of the propriety of the death sentence see part XXVII, infra.

VII.
The appellant contends that the court improperly sentenced him for both burglary in the third degree (CC-91-2533) and theft of property in the first degree (CC-91-2534), convictions arising out of the same transaction, i.e., entering and removing property from the home of Carrie Ware. He likewise contends that the trial court improperly sentenced him for both burglary in the first degree (CC-91-2535) and theft of property in the second degree (CC-91-2536), convictions arising out of the same transaction, i.e., entering and removing property from the home of Sheila Rhodes. We agree.
The trial court sentenced the appellant to 10 years' imprisonment in case CC-91-2533 and to 20 years' imprisonment in case CC-91-2534, and it sentenced him to 20 years' imprisonment in case CC-91-2535 and to 10 years' imprisonment in case CC-91-2536. The trial court ordered that these sentences (along with the sentences for escape in the third degree and theft of property in the second degree) be served consecutively. Thus, the appellant was improperly punished twice for the two transactions. As the appellant notes in his brief, Pardue v. State, 571 So.2d 320, 330 (Ala.Cr.App.1989), directly controls this issue, wherein the court held:
"The defendant was improperly sentenced for both burglary and theft arising out of the same act. Gray v. State, 338 So.2d 444 (Ala.Cr.App.), cert. denied, 338 So.2d 445 (Ala.1976). Although ง 15-3-8, Code of Alabama 1975, does not forbid double conviction for these offenses, it does forbid double punishment. Parker v. State, 516 So.2d 859 (Ala.Cr.App.1987). When the same criminal transaction supports both burglary and theft there can be but one punishment. Wildman v. State, 42 Ala.App. 357, 165 So.2d 396 (1963), cert. denied, 276 Ala. 708, 165 So.2d 403 (1964). `Whether this rule is served by a single sentence or concurrent sentences is a matter confided to the judge's discretion.' Gray v. State, 338 So.2d at 445."
We, therefore, find it necessary to remand this case to the trial court for proper sentencing for burglary of, and theft of property from, the Ware house and Sheila Rhodes's house. We direct the trial court's attention to McKelvey v. State, 630 So.2d 60, 61-62 (Ala.Cr.App.1993), for guidance in imposing sentence.
The state urges, in its brief, that we hold this sentencing error to be harmless, stating that it would be pointless to remand for resentencing on these convictions because the appellant has also been sentenced to death. It appears that the state is arguing that the lesser sentences are immaterial because they are outweighed or swallowed up by the greater sentence of death. This argument is without merit.

VIII.
The appellant contends that the trial court committed several errors in its oral charge at the guilt phase of the trial.

A.
He contends that the trial court erred in failing to charge the jury on the allegedly lesser included offense of felony-murder. He argues that the evidence required the giving of such an instruction; that the trial court agreed in the charge conference *454 that it would give the instruction; that it failed to do so; and that, in structuring his closing argument to the jury, he relied to his detriment on the trial court's agreement. Because no objection was made to the actions of the trial court in this regard, we apply the plain error standard. The plain error rule applies to oral instructions to the jury in capital cases. Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). The failure of the appellant to object to the charge weighs against him as to any claim of prejudice. Ex parte Kennedy, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985).
The evidence upon which the appellant bases his claim that he was entitled to a felony-murder instruction is found in the appellant's confession. He summarizes this evidence in his brief and argues that even though he entered Helen Rhodes's home with the intent to kill her, he changed his mind, panicked at the last moment, and unintentionally killed her. For a better understanding of this issue, we quote from the appellant's confession, transcribed from an audiotape, as follows:
"[Knotts]: ... I was sitting in there waiting.... And she still didn't show up after 7:00, so I, you know, I had waited.
". . . .
"In the dark looking at the window. And then I noticed a car driving up. And, ah, the whole time I was sitting in there that's when, that's when everything, everything just started rushing at me. I went in there first, first I had my mind just go out the front door you know and leave. And, ah, I was fixin' to do it, you know, and then I ran in there and there was a gun sitting in there. Time I got around to the thing I heard the door slam and I, you know, you can see through the window.
". . . .
"They had one of the curtains that you can see through and I figured that she would see me run by with the stuff. And, ah, I, ah, went up to the thing and I stood by the door and I, I, I grabbed the gun out of the thingโthat little Derringer.
". . . .
"I was shaking. Cause I was afraid I was [going to] get caught and everything with a gun and all that and I was shaking. I didn't know what to do. And then I heard, then I heard a little kid and that, that started scaring me right there and I was [fixing] to, I didn't care if she seen me or not I was fittin to run out. And the door opened and she had close, she closed the door and ah....
". . . .
"She had turned the living room light on and went to the kitchen. I stand beside the door and, ah, the little boy was outside, she had came into the house and, ah, but she had.
". . . .
"She didn't see me. You know, I, I didn't even fire. You know, she had her back to me and everything. I didn't fire. I took the, ah, gun and put it beside me. I was shaking real bad. I didn't know what to do. You know, I, I didn't know whether to shoot or you know, just to try to run out the door. Ah, the little kid was still outside and, ah, she, she's, she came around the thing and the door was still like this and I was behind the door. She came up, ah, out the kitchen she started hollering at him and telling him to come inside. He came inside there. And, uh, when he came inside she closed the door and she turned her back to me and, ah, I was standing there. I didn't, I didn't fire then either, you know, cause I didn't know what to do. Ah, so I took the gun and, ah, she walked by to the mantle and, ah, I couldn't, I didn't know if she had saw me or not. I mean everything happened so quick she, she looked around and I was looking and, ah, she turned back around and started walking toward the thing and I....
". . . .
"I'm still in the washroom so I took, I took the little boy ah he ran into the room real quick. I don't know if he, cause when I looked around the thing, he [wasn't] in the kitchen anywhere. You know, I saw his light was on in his room so I, ah, took the, I took the gun, I [brought] it out, he come, he come running out of the room across *455 the hall or something. I took the gun and, ah, I imagine I pulled the trigger and it, and it, and shot when she walked by, you know, she walked by and I shot and, ah, I saw the window bust. The windows is busted. One of the storm windows is busted. And, ah, she, I figured that I had missed her. Well, and, ah, I saw her sit, sit down. She sit down and then, ah....
". . . .
"I didn't, she didn't say anything. I just panicked and pulled the gun the trigger again. I didn't even pull the trigger back I just snapped it. It went off.
". . . .
"She was looking at me. I just pulled the trigger. I ain't....
". . . .
"... But then when she started driving up that's the time I started getting nervous and everything. Ah, that's when my mind start saying you just, you doing the wrong thing. You're doing the wrong thing. And it was too late, you know, `cause I couldn't get out, I couldn't get in. But I was in but I couldn't get out....
". . . .
"`Cause I was in the living room at that time. Time, she, time she went by me and I shot the first shot and it went through the window I turned around and she set on the couch and she looked right at me.
". . . .
"Q. [Investigator]: How long had you been in the house?
"A. [Knotts]: I'd say about an hour and a half.
"Q. Well, you knew she was coming home, didn't you?
"A. I knew she was coming home.
". . . .
"Q. Okay, when you was waiting at that time what was you thinking about?
"A. I was thinking about shooting her.
". . . .
"A. Yeah. But, ah, when I got in there, that whole day, when I, went, when she drove up, that whole shooting deal, lost, left out my mind.
"Q. But you shot her?
"A. Yeah....
"Q. Could you, could you have at that time could you have picked up your stuff and walked out the side door?
"A. Yeah I could. But what I was saying is, when I was standing there....
". . . .
"A. And the little and when the little boy was outside the woman had came right, she come up there and if I had went out she would have still saw me.
". . . .
"Q. Did she see you at that point? She never saw you until you shot her the first time, right?
"A. That's right. I shot first at the window, I didn't shot.... I was trying to shoot at her I, I didn't know what I was shooting at you know, I was just shooting the gun.
"Q. But was you, did you mean to shoot at her?
"A. Yes sir.
"Q.... [W]hy did you shoot her the second time? ...
". . . .
"A. It was more an impulse, man.
". . . .
"A. I don't think I shot her for that reason at all.
"Q. But you were there earlier and that's what you went in there.
"A. That was what I was there for the first part.
". . . .
"A. But I don't think I shot her for that... reason. I think that I shot her because I panicked. Cause the gun was cocked back and ... was ready to shot. And I had my finger on the trigger. And when I pulled that trigger the first shot went past her. Whether it hit her I don't know or went through her or what I don't know and it hit the window.
". . . .
"Q.... When did you start thinking about shooting that woman?
"A. When I got in the woods.
". . . .

*456 "Q. Did you continue to think about shooting that woman when you were in her house? You have to answer me?
"A. Yes.
". . . .
"A. When I shot her the first time, she sat on the couch at the far end, going toward the kitchen.
". . . .
"A.... As soon as she got up started walking she fell. And I, and that's when, that's when I just, I just pulled the trigger.
". . . .
"Q. Did you have time to leave that house before she got there?
"A. Yes sir. For a long time.
"Q. Then why didn't you leave?
"A. I was sitting. I was just sitting on the couch waiting. `Cause I, at the time, at that time I was figuring that I could do and get it over with and I had, I had, I would have it made. When I was sitting at the couch, I was sitting ... thinking that if she drive up I'd shoot her and it'll be over with. You know but when she drove up and had her kid in her hand. I mean and outside with her and I heard the kid hollering and everything. That's when I started panicking. I panicked when she drove up, I didn't even see the kid. I saw I don't know I just everything just happened so fast. It was like everything was happening faster than I was acting.
"Q. You realize what you're telling me?
"A. Yeah. In my I think my I think my nerves, I think my impulses is what made me do it.
"Q. Do you, you're telling me that you killed somebody else. Another human being. That you shot her twice.
"A. I did.
". . . .
"Q. And you're saying while it it went on, that you wanted to, to not do it but yet you did, you did it anyway. Is that right? You have to answer me?
"A. Yes.
"Q. Is, now tell me is that right or wrong?
"A. That's right.
". . . .
"A. I killed her and I deserve what I get."
It is the duty of the trial court to state the law of the case to the jury. Cole v. State, 352 So.2d 17 (Ala.Cr.App.), cert. denied, 352 So.2d 20 (Ala.1977). The trial court must instruct on the law applicable to all theories presented by the testimony. Glover v. State, 21 Ala.App. 423, 109 So. 125 (1926). The trial court has broad discretion in formulating its jury instructions, provided those instructions are accurate reflections of the law and facts of the case. Ward v. State, 610 So.2d 1190 (Ala.Cr.App.1992).
"An individual accused of the greater offense has a right to have the court charge on the lesser offenses included in the indictment, when there is a reasonable theory from the evidence supporting his position. Fulghum v. State, 291 Ala. 71, 277 So.2d 886 (1973). A court may properly refuse to charge on lesser included offenses only (1) when it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense, or (2) when the requested charge would have a tendency to mislead or confuse the jury. Lami v. State, 43 Ala.App. 108, 180 So.2d 279 (1965). In fact, our decisions are to the effect that every accused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which are supported by any evidence, however weak, insufficient, or doubtful in credibility. Burns v. State, 229 Ala. 68, 155 So. 561 (1934)."
Chavers v. State, 361 So.2d 1106, 1107 (Ala. 1978).
At the initial charge conference immediately preceding closing arguments in the guilt phase, the trial court agreed to charge the jury on felony-murder; however, it did not do so. Another charge conference was held before the case was submitted to the jury, and the trial court was informed that it failed to charge on felony-murder. After some discussion as to how the court intended to word its felony-murder charge, it charged the jury as follows:

*457 "Ladies and gentlemen, on the charge of murder, I charge you a person commits the crime of murder if with the intent to cause the death of another person, he causes the death of that person or of another person. I'll continue with: He commits or attempts to commit ... burglary in the first or second degree, robbery in any degree, or any other felony clearly dangerous to human life, and, in the course of and in furtherance of the crime he is committing or attempting to commit, or in immediate flight therefrom, he, or another, participant if there be any, causes the death of any person."
The appellant's contention that the trial court failed to charge the jury on felony-murder is not supported by the record. The charge as given tracks the language of the statute defining intentional murder and felony murder. ง 13A-6-2(a)(1) and (3). While the charge could have been structured so as to better inform the jury of the felony-murder doctrine, it was nevertheless a felony-murder charge. The appellant was apparently satisfied with the charge, because he lodged no objection and did not ask for an explanation of the charge. Moreover, the appellant's requested written charges pertaining to felony murder (which were refused) and the charge actually given are indistinguishable. The written requested instructions merely tracked the felony-murder subsection to the murder statute as did the trial court's oral charge on felony-murder. No objection was raised to the court's refusal to give the requested written instructions.
The appellant contends that regardless of whether he was entitled to an instruction on felony-murder, his constitutional rights were violated when his trial counsel structured their closing arguments in reliance on the trial court's agreement to charge the jury on felony-murder. We find no merit in this contention. Foremost, as we have previously pointed out, the trial court instructed the jury on felony-murder. Moreover, the closing arguments reported in the record fail to support the appellant's assertion that his counsel structured their closing arguments "around a theory of defense that Mr. Knotts had shot and killed Mrs. Rhodes, but that he did so in a spontaneous panic and, because he lacked an intent to kill, was guilty only of felony-murder." One of the appellant's trial counsel asserted in closing argument that the appellant changed his mind when the victim walked into the house and that he shot the victim in panic. He urged the jury to find the appellant guilty of "straight murder" and not "capital murder." (By "straight murder," counsel could have been referring only to intentional murder because intentional murder was the only murder alternative argued to the jury.) It is noteworthy that counsel never used the term "felony-murder" and never undertook to define the doctrine or to discuss it with the jury. The other trial counsel did not argue felony-murder at all. He took a completely different approach: he urged the jury to believe that the appellant entered the victim's house for the sole purpose of killing her, with no intent to commit a robbery or burglary, and thus, that he could not be guilty of the capital crime of murder-robbery or murder-burglary.
The evidence to support a felony-murder charge, if any, was so slight that it is highly improbable that the jury considered finding the appellant guilty of felony-murder. A felony-murder is committed when a person commits or attempts to commit one of several enumerated felonies, and, in the course of or in furtherance of the crime or in flight from the crime, that person causes another person's death. There is an intended felony and an unintended homicide. Ex parte Bates, 461 So.2d 5 (Ala.1984); Johnson v. State, 620 So.2d 679 (Ala.Cr.App.1992), rev'd on other grounds, 620 So.2d 709 (Ala.1993); C. Torcia, Wharton's Criminal Law, ง 147 (15th ed. 1994).
This case offers no typical felony-murder theory. There is little evidence, if any, to support a finding by the jury that the appellant committed felony-murder. The only reasonable conclusion to be drawn from a fair reading of the appellant's confession is that he intended to murder the victim. Even if it were concluded that there was slight evidence that the first shot fired was unintentional, it is clear from his statement that he intended to kill the victim with his second *458 shot. Moreover, he has never theorized that the shooting was accidental or that he was only trying to burglarize the house or steal the automobile. He may have gotten scared or may have panicked, but the evidence is strong that he intended to kill the victim. In fact, as noted, both defense counsel conceded his guilt of intentional murder.
That the appellant did not object to the jury charge or to the denial of his written charges and did not argue felony-murder to the jury indicates that he did not seriously consider a felony-murder theory applicable to his case. While the charge was not as clear as it could have been, we do not believe under the circumstances here that the jury was misled by it, and we find no plain error. Looking at the charge as a whole, the evidence presented, and the arguments of counsel, there is no reasonable likelihood that the jury applied the questioned instruction in an impermissible way. If there was error here, it did not seriously affect the fairness and integrity of the proceedings.
The appellant raises an issue in a footnote on page 85 of his brief: whether the trial court erred in refusing to charge the jury on "extreme indifference murder," ง 13A-6-2(a)(2), as a lesser included offense. Clearly, under the facts of this case, there is no merit to this contention. An instruction on reckless murder is not warranted if the accused's conduct was directed toward one individual rather than human life in general. McLaughlin v. State, 586 So.2d 267 (Ala.Cr. App.1991).

B.
The appellant contends that the trial court erred when it "constructively amended" the indictment in the capital case (CC-91-2537) by giving "generic instructions on robbery and burglary as elements of capital murder by reading the definitions of these offenses straight from the statute book." He argues that, instead, the court should have specified the items that the jury would have to find were stolen by the appellant to convict him of murder-robbery, and also have specified the crime that the jury would have to find the appellant intended to commit when he entered the victim's home to find him guilty of murder-burglary. No objection was made in the trial court to the instructions, and thus we review the instructions under the plain error rule.
The trial court did not read the indictments to the jury. However, the evidence presented, the details and explanations of each indictment presented by the state in its opening statement and closing arguments, the trial court's instructions in their entirety, and the comments of the trial court to the jurors at the time of voir dire examination and at the commencement of the trial about the nature of the cases to be tried, considered together, sufficiently defined the crimes charged. This included the crimes the appellant was alleged to have intended to commit in burglarizing the victim's home, i.e., murder, robbery and/or theft, and the specific items he was alleged to have stolen from the victim's home, when committing murder and robbery, i.e., a Toyota automobile, jewelry, shoes, clothing, and bags. Moreover, the details of the crimes presented by the state are not contested by the appellant but are conceded. He admits that the events occurred. He admits that the detailed description of his actions in his confession is truthful. He disagrees only with the interpretation of the details as applied to the crimes committed in the victim's home. His counsel stated to the jury in closing argument, "I didn't tell you that all this stuff didn't happen. The only thing I told you was that the facts in this case indicated that it may not be a capital murder case." The crimes charged were so clearly defined and presented that it would be highly improbable that the jury would have been misled by the trial court's instructions on robbery and burglary. In our opinion, there is no reasonable probability that the jury would have found the appellant guilty of a crime not charged or of a theory not presented. We find no plain error in the instructions given. The cases cited by the appellant in support of his contention are factually distinguishable from this case.

C.
The appellant contends that the trial court's charge to the jury in the guilt phase *459 of the trial, taken as a whole, failed to properly inform the jurors that he could not be convicted of the capital offenses unless he specifically intended to cause the death of the victim. He argues that the instructions invited the jurors to find him guilty of the capital offenses if they believed that he intended to commit the underlying acts that led to the victim's death, even if he did not intend to kill her. Again, no objection was made in the trial court to the instructions on this ground. We find no merit in this contention. Considering the trial court's instructions in their entirety, as we are required to do, we find that they clearly instructed the jury that in order to find the appellant guilty of the capital offenses it would have to find beyond a reasonable doubt that the murder was intentional. We find no error in the charge in this regard.

D.
The appellant contends that the trial court's jury instructions on the robbery component of the capital offense of murder-robbery focused on robbery in the third degree in a manner that may have led the jurors to believe that they could convict the appellant of the capital offense based on a finding that he had committed "a less serious form of robbery." We find no merit in this contention. Construing the instructions in their entirety, we conclude that they clearly instructed the jury that in order to find the appellant guilty of the capital offense of murder-robbery, it would have to find that he committed murder during a robbery in the first degree or an attempt thereof. The trial court correctly instructed the jury on the elements of the offense of robbery in the first degree.

E.
The appellant contends that the trial court's jury charge on reasonable doubt "impermissibly diluted" the state's burden of proof in violation of his constitutional rights. He bases this contention on the portion of the charge defining reasonable doubt as "an actual and substantial doubt" and on the instruction that "what springs naturally back from your conscience and mind is that `I have no doubt.'" He relies on Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), to support his contention.
The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). In Cage v. Louisiana, the United States Supreme Court found that a jury charge that defined "reasonable doubt" by using the phrases "grave uncertainty," "actual substantial doubt," and "moral certainty" could have led a reasonable juror to interpret the instructions to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause. Subsequently, the Court "made it clear that the proper inquiry is not whether the instruction `could have' been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury did so apply it." Victor v. Nebraska, 511 U.S. 1, 6, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583 (1994) (quoting Estelle v. McGuire, 502 U.S. 62, 72-73, and n. 4, 112 S.Ct. 475, 482 and n. 4, 116 L.Ed.2d 385 (1991), emphasis in original). Thus, the constitutional question presented here is whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the Winship reasonable doubt standard. Victor v. Nebraska; Ex parte Kirby, 643 So.2d 587 (Ala.), cert. denied, ___ U.S. ___, 115 S.Ct. 591, 130 L.Ed.2d 504 (1994); Cox v. State, 660 So.2d 233 (Ala.Cr.App.1994).
In reviewing the reasonable doubt instruction, we do so in the context of the charge as a whole. Victor v. Nebraska; Baker v. United States, 412 F.2d 1069 (5th Cir.1969), cert. denied, 396 U.S. 1018, 90 S.Ct. 583, 24 L.Ed.2d 509 (1970); Williams v. State, 538 So.2d 1250 (Ala.Cr.App.1988). So long as the definition of "reasonable doubt" in the charge correctly conveys the concept of reasonable doubt, the charge will not be considered so prejudicial as to mandate reversal. Victor v. Nebraska; Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954).
*460 In this case, the trial court instructed the jury as follows:
"Now, the burden of proof in this case... is on the state or the government entity that charges a person with having violated the law to prove that person's guilt beyond a reasonable doubt and to a moral certainty. Now you have heard that phrase used, no doubt, all of your life. I'm going to try to define it for you now as the law defines it. The law says a doubt which would justify an acquittal, that is not guilty, must be an actual and substantial doubt, not just a mere possible doubtโ strike that. The law says a doubt which would justify an acquittal must be an actual doubt, not just a mere possible doubt. A reasonable doubt is not a mere guess or surmise and it is not a capricious doubt. If after considering all of the evidence in the case you have an abiding conviction of the truth of the charge, the charge in all of the cases or the charge in one case or two cases, three cases, etc., then you're convinced beyond a reasonable doubt and it would be your duty to convict the defendant in any case or all cases that you are convinced beyond a reasonable doubt and to a moral certainty that he's guilty. On the other hand, if after considering all the evidence in the cases you do not have an abiding conviction of the truth of the charge or charges, then you're not convinced beyond a reasonable doubt and it would be your duty to acquit the defendant on all the charges or any charge that you have not been convinced beyond a reasonable doubt and to a moral certainty that he is guilty. The law says evidence which merely gives rise to a surmise, conjecture or suspicion of guilt is not sufficient in order to base a conviction upon it. Also, the reasonable doubt which entitles an accused to an acquittal is not a mere fanciful, vague, conjectural or speculative doubt, but a reasonable doubt arising from the evidence and remaining after a careful consideration of the testimony such as reasonable, fair minded, conscientious men and women would entertain under all the circumstances. You will observe, ladies and gentlemen of the jury, that the state is not required to convince you of the defendant's guilt beyond all doubt, but simply beyond all reasonable doubt. Beyond a reasonable doubt means beyond a doubt for which a reason may be given. That is the way the law defines reasonable doubt. Now basically what it says is this. Reasonable doubt, do you have any doubt that the state has proved the defendant guilty to your satisfaction? If you have doubt on any or all the charges then you should acquit the defendant. If you have no doubt, based on the evidence, then you should convict the defendant. And so it's basicallyโlet me try to explain it a little bit in a little more simpler terms. You have a duty and it's your duty under the oath that you have taken to render a fair and impartial verdict based on the evidence and the law. So when you go into the juryroom, of course you decide how you want to do it, but you sift through the evidence, talk about it or think about it, and then you ask yourself individually firstโbut you have to come together collectively because any verdict you reach must be a unanimous verdictโbut I assume you have to first ask yourself a question after you have looked at the evidence and recall it the way you recall it from what went on in the courtroom, then maybe discuss it in the juryroom. Then you, figuratively speaking, set the evidence out there before you and say, Is the defendant guilty on all or any charges?' And if what springs naturally back from your conscience and mind is that I have no doubt that he is, based on the evidence, then you have been convinced beyond a reasonable doubt and it would be your duty to convict the defendant. On the other hand you do the same with the evidence and if what springs naturally back from your conscience and mind is that I have doubt that he is [guilty] based on a lack of evidence or the evidence on all or any of the charges, then it would be your duty to acquit the defendant on all or any charge that you find the state has not proved his guilt beyond a reasonable doubt and to a moral certainty."
The appellant objected to the instructions, and his objection was overruled by the trial court.
*461 In reviewing the reasonable doubt instruction in the context in which it was given, and in reviewing the charge as a whole, we do not find that this instruction contains the same flaw condemned in Cage. The trial court in the instant case did use the words "actual and substantial doubt" and "moral certainty"; however, it did not use the phrase "grave uncertainty." This case is clearly distinguishable from Cage. We find that taken as a whole the reasonable doubt instruction correctly conveyed the concept of reasonable doubt to the jury. The trial court's instructions on the presumption of innocence, burden of proof, and weighing of evidence support our finding. We conclude that there is no reasonable likelihood that the jury applied the instructions in such a manner as to violate the appellant's constitutional rights. The state argues that the trial court withdrew its instruction that contained the words "actual and substantial doubt" when it followed it with the words "strike that." In view of our holding that the charge considered as a whole met constitutional requirements, we find it unnecessary to address this argument. The statement complained ofโ "what springs naturally back from your conscience and mind is that I have no doubt"โ when considered in the context of the charge as a whole, does not support the appellant's contention.

F.
The appellant contends that because the indictment charging him with capital murder contained two separate counts, i.e., a count charging murder-robbery and a count charging murder-burglary, the trial court should have charged the jury that its verdict had to be unanimous as to at least one of those offenses before convicting him of capital murder. He contends that the failure of the trial court to give a specific unanimity instruction as to each count denied him due process and requires a reversal of his capital murder convictions. He argues that the absence of a specific unanimity instruction as to each count "invited the jury to convict him of capital murder as long as each juror believed him guilty of either murder-robbery or burglary-murder." The state argues that because of the undisputed facts of the case, the jury in "all reasonable probability" found the appellant guilty on both counts and, under the circumstances of this case, no error occurred.
The problem presented here is the danger of a composite or patchwork verdict, which would violate the principle that a jury's verdict be unanimous. A unanimous verdict is guaranteed by this state's constitution. Art. I, ง 11, Constitution of Alabama 1901; Clark v. Container Corp. of America, Inc., 589 So.2d 184 (Ala.1991); Dixon v. State, 27 Ala. App. 64, 167 So. 340, cert. denied, 232 Ala. 150, 167 So. 349 (Ala.1936).
"The rule relating to a unanimous verdict requires jurors to be in substantial agreement as to just what a defendant did as a step preliminary to determining guilt. The requirement of unanimity of verdict ordinarily extends to all issues which are left to the jury, including the character or degree of the crime charged, and the underlying factual elements.
"However, jurors are not required to accept uniformly all of the evidence presented in order to arrive at a unanimous verdict, or to be in agreement as to what particular evidence is believable or probative on a specific issue or element of crime, particularly where there is evidence to support alternative theories as to how an element of the crime occurred.
"If a statute describes a single offense which may be committed in more than one factual manner, or by way of different acts, jury unanimity is not necessary as to the means by which it is committed, where the acts are conceptually similar or not repugnant to each other or may be characterized as continuous, provided substantial evidence has been presented to support each of the alternative means. However, if the statute sets forth several conceptually distinct acts, whether or not making commission of each a separate crime, there must be a unanimous verdict as to each separate act involved."
23A C.J.S. Criminal Law ง 1398 (1989) (footnotes omitted).
The capital offenses listed in ง 13A-5-40 describe conceptually distinct acts or *462 crimes requiring unanimous verdicts as to each separate act or crime charged in order to find a defendant guilty. Seritt v. State, 647 So.2d 1 (Ala.Cr.App.1994); Jackson v. State, 516 So.2d 726 (Ala.Cr.App.1985). Rule 23.2(c)(1), Ala.R.Cr.P., provides: "If different counts or offenses are charged, a verdict shall be returned on each count or offense charged...." The Committee Comments to Rule 23.2 state:
"Section (c) departs from the common law in Alabama, which allowed a general verdict of guilty to be returned if any one count or offense in the indictment was sustained by the proof, so long as the sentence pronounced did not impose a greater punishment than that prescribed for one of the offenses charged in the indictment. See Black v. State, 39 Ala. App. 269, 97 So.2d 833 (1957) (upheld general verdict returned on indictment in two counts charging two distinct offenses).
"Rule 23.2(c)(1) requires the jury to specify the particular counts on which it finds the defendant either guilty or not guilty. The provision ensures that the verdict will be clear and unambiguous. Under this rule, the jury must return a verdict on each of the counts, rather than one verdict specifying each count of which the defendant has been found guilty or not guilty. Under section (a) the jury shall find the defendant either guilty or not guilty on each count.
"Subsection (2)[13] of Rule 23.2(c) was included in order to avoid any confusion that different verdicts of guilty and not guilty on different charges might cause and to avoid any ambiguity over which count the defendant is found guilty of, thus enabling the judge to sentence the defendant only for those counts or offenses of which he is found guilty. This subsection is needed in view of the ability to join separate offenses in the same indictment."
In this case, the trial court instructed the jury on the elements of the capital offense charged in each count of the capital murder indictment. It charged the jury that a person commits capital murder when there is a murder by the defendant during the commission of a robbery in the first degree or an attempt thereof, and when there is a murder by the defendant during the commission a burglary in the first or second degree or an attempt thereof. The court defined murder, robbery in the first degree, burglary in the first and second degrees, and other essential terms contained in the indictment charging the capital offenses. The court instructed the jury that "whatever verdict you reach must be a unanimous verdict. That means all twelve of you must agree."
The court did not instruct the jury that it was required to make a separate finding of guilty or not guilty on each of the counts as required by Rule 23.2(c)(1). It did not charge the jury that unanimity on each specific count would be necessary to find the appellant guilty of each specific count. No objection was made to the failure to so instruct the jury, and, in fact, the appellant agreed to the general verdict form submitted to the jury covering the capital murder counts. The verdict form, which was agreed to and returned by the jury, stated: "We, the jury, find the defendant guilty of Capital Murder." The jury was polled, and each juror acknowledged that the verdict represented his or her verdict.
The question that we must decide here is whether, under the circumstances of this case, given the requirement of a specific unanimous verdict on each count of the capital murder indictment, the trial court committed reversible error in failing to instruct the jury that a unanimous verdict on each count was necessary in the absence of a request to do so or an objection to the instructions. Because no objection to the instructions was raised in the trial court, we review this issue under the plain error rule.
Under Alabama law, the appellant, having been accused of two distinct criminal acts, had the right to a unanimous finding of guilt as to one count or as to both counts. Such a requirement protects against the danger of a general verdict of guilt resulting from some jurors' finding him guilty on one count and *463 others' finding him guilty on the other count. The general instructions on unanimity in the instant case raise the possibility that the jury was not adequately informed that its duty was to agree on a unanimous verdict as to each count. In the typical case involving a general verdict, it is difficult, if not impossible, to determine which count or counts the verdict was based upon. However, this case is not typical: because of the undisputed facts, we can safely conclude that the jury, in all reasonable probability, unanimously found the appellant guilty on both counts. In reaching the general verdict of guilt, the jury of necessity had to unanimously find the appellant guilty of intentional murder, one of the two components of each count. The facts constituting the burglary and the robbery, the second components of the capital murder counts, were admitted by the appellant: he admitted breaking into the victim's home, killing her with a pistol, and stealing various items, including her automobile. Every element necessary to sustain convictions under both counts was clearly proven. There is no reasonable possibility here, in view of the facts, that the jury was confused or misled by the general unanimity instruction or by the trial court's failure to instruct the jury on specific unanimity as to each count. There was no risk here of a composite or nonunanimous verdict. The jury obviously found the appellant guilty of both counts. We find no plain error.

G.
The appellant contends that the trial court erred in instructing the jury during the guilt phase as follows: "Now the law says if you find differences or discrepancies in the testimony, your first job is to reconcile it and mesh it together and make it all speak the truth." He argues that this instruction "created a presumption of truth in favor of the state's evidence of guilt." No objection having been made to this instruction, we review the contention under the plain error rule.
An instruction to the jury should not be judged in isolation, but must be viewed in the context of the charge as a whole. Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.1991), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). We have reviewed the instruction complained of in the context of the charge in which it was given and conclude that it did not create in the minds of the jurors a presumption of truth in favor of the state's evidence as contended by the appellant. The instruction, when considered with the remainder of the charge dealing with the responsibility of the jury to assess the credibility of the witnesses and to weigh the evidence, was not misleading and did not invade the province of the jury. We find no plain error in the giving of this instruction.

IX.
The appellant contends that the admission into evidence of the items seized during a search of the victim's automobile, which he was driving at the time of his arrest, was reversible error because, he says, the prosecution failed to establish any basis for the radio communications that purportedly constituted probable cause for his arrest. He argues that the "BOLO" dispatches upon which the arresting officer relied were insufficient to establish probable cause for the warrantless arrest and search of the automobile because the prosecution never offered any evidence to show that the Montgomery County Sheriff's Department had probable cause for issuing them. We find no merit to these contentions.
"Whether a warrantless arrest is constitutionally valid depends on `whether, at the moment the arrest was made, the officers had probable cause to make it.' Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); Sexton v. State, 349 So.2d 126 (Ala.Cr.App.1977). See ง 15-10-3(3), Code of Alabama (1975). Probable cause cannot be satisfied on the basis of a radio dispatch alone. Ex parte Paschal, 365 So.2d 681, 682 (Ala.1978); Owens v. State, 51 Ala.App. 50, 282 So.2d 402, cert. denied, 291 Ala. 794, 282 So.2d 417 (1973). See Whiteley v. Warden, Wyoming State Penitentiary, 401 U.S. 560, 568, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306 (1971). `While the arresting officers may rely on radio broadcasts "the subsequent determination by any court as to probable cause must necessarily turn on all the circumstances *464 giving rise to the police dispatch." `Rudolph v. State, 371 So.2d 962, 964 (Ala.Cr.App.), cert. denied, Ex parte State ex rel. Attorney General, 371 So.2d 965 (Ala.1979) (quoting Owens v. State, 51 Ala.App. at 61, 282 So.2d at 413)."
Brinks v. State, 500 So.2d 1311, 1313 (Ala.Cr. App.1986).
The evidence presented at the juvenile transfer hearing and at the trial in this case established the following: The appellant, who was in the custody of the Department of Youth Services, escaped from the Mt. Meigs campus on October 17, 1989. That same day, the Department of Youth Services issued a "pickup order" for him to all Alabama law enforcement officers. Ex parte W.T.K., 586 So.2d 850 (Ala.1991). The following day, October 18, Ware and Sheila Rhodes notified the Montgomery County Sheriff's Department that their homes had been burglarized, and later that evening, the victim's husband, upon discovering his wife's body, called one of the members of his church who in turn notified the sheriff's department. The burglaries and the murder all occurred the day after the appellant escaped, and all were within a short distance of the Mt. Meigs campus. Upon investigation, the sheriff's department learned that the victim's automobile was missing, as well as a number of guns and other items that had been taken in the burglaries. Two BOLOs were issued shortly after midnight that nightโthe first at 12:20 a.m., on October 19, and the second at 12:41 a.m. The dispatches described the appellant and the stolen automobile and stated that he was an escapee from the Department of Youth Services, that he was probably armed, that he was wanted in connection with several burglaries and a murder, and that he could possibly be heading to either Dothan or Jefferson County. We find that clearly the circumstances in this case provided probable cause for the Montgomery County Sheriff's Department to believe that the appellant had committed the crimes and thus to issue the radio dispatches.
Officer Loebler of the Birmingham Police Department, who was working her shift on the night of October 18-19, 1989, received information during rollcall that a BOLO had been issued for the appellant. While she was on patrol, she observed an automobile matching the description given in the BOLO parked in the lot of a business; she verified the license tag number; upon approaching the car, she saw the appellant asleep in the back seat; and she observed that his clothing matched the description given of the clothes the suspect was wearing. She arrested the appellant, called for a wrecker to two the automobile, completed a partial inventory of the automobile, and transported the appellant to the police station. Because, as we have held, there was probable cause for the Montgomery County Sheriff's Department to issue the BOLO dispatches, Loebler's reliance upon the dispatched information in arresting the appellant was proper. Accordingly, the items seized as a result of the search of the victim's car were properly admitted into evidence.
The appellant argues that there was no proof that any interviews, visits to the scene of the burglaries and the murder, or other investigation by the Montgomery County Sheriff's Department occurred before to Loebler's arrest of the appellant. This argument is factually without merit.

X.

A.
The appellant contends that his custodial statements to law enforcement officers should have been suppressed because, he says, the state failed to establish the basis for the issuance of the BOLO dispatches and thus his statements were "fruits of his warrantless arrest." As discussed above, there is no merit to this argument. The appellant's statements to the Birmingham Police Department and to the Montgomery County Sheriff's Department were properly admitted into evidence. We note that, once again, the appellant attempts to raise an additional issue in a footnote in his briefโthe one regarding the BOLO dispatches. We find no merit to the argument raised in footnote 83 to the appellant's brief.

B.
The appellant contends that the law enforcement officers who questioned him after *465 his arrest violated his right to counsel because, he says, he was represented by appointed counsel at the hearing that had resulted in his commitment to the custody of the Department of Youth Services and therefore his appointed counsel continued to represent him up to and including the time of his arrest and interrogation. We find no merit to this contention. There is nothing in the record to indicate that the appellant was represented by counsel at the time he was arrested. Even assuming arguendo that he was represented by counsel in an unrelated matter, upon being given his juvenile rights pursuant to Ala.R.Juv.P. 11(B), the appellant specifically waived the right to counsel and the right to have a parent or guardian present before making his statements to the officers.
In a footnote to his brief in the discussion of this issue, appellant states, "Even were Mr. Knotts's videotaped statement to investigators properly admitted, it was error for the trial judge to allow the prosecution to introduce irrelevant, highly prejudicial portions of the confession dealing with other juvenile offenses with which appellant had recently been charged." Because there was no objection on this basis, we must look at this contention under the plain error rule. We have reviewed the record and find that the matters complained of were references to minor disciplinary infractions that occurred while the appellant was in the custody of the Department of Youth Services. Compared to the felony charges against the appellant, the disciplinary infractions were insignificant and could not have reasonably affected the fairness and integrity of the trial. We find no plain error here.

C.
The appellant contends that his statements to law enforcement officers should have been suppressed because the officers did not notify the appellant's parents or other adult relative before obtaining his statement. This issue has previously been addressed by this court and found to have no merit. W.T.K. v. State, 586 So.2d at 851.

XI.
The appellant contends that the burglary-murder count of the indictment was impermissibly duplicative because, he argues, the elements of intent to kill and the death of the victim are elements of both the burglary and the murder components of the charge. He argues that ง 13A-5-40(a)(4), formerly ง 13A-5-31(a)(4), was designed to cover only those situations in which the offender enters a dwelling with the intent to commit an offense other than murder. This contention was rejected in White v. State, 587 So.2d 1218, 1228 (Ala.Cr.App.1990), aff'd, 587 So.2d 1236 (Ala.1991), cert. denied, 502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed.2d 142 (1992).
"In Duncan v. State, 436 So.2d 883, 904-05 (Ala.Cr.App.1983), cert. denied, 464 U.S. 1047, 104 S.Ct. 720, 79 L.Ed.2d 182 (1984), this Court rejected the contention that `the legislature did not intend ง 13A-5-31(a)(4), Code of Alabama 1975 [now ง 13A-5-40(a)(4)] to be applied except in cases where the burglary "was unrelated to and not for the purpose of the killing itself."' See also State v. Monroe, 397 So.2d 1258, 1273-74 (La.1981), cert. denied, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1411 (1983)."
White v. State, 587 So.2d 1218, 1228 (Ala.Cr. App.1990).

XII.
The appellant contends that the trial court erred in admitting into evidence over his objection a card with a latent fingerprint lifted from a key in back door to Sheila Rhodes's residence. He alleges that its chain of custody was incomplete. We do not find it necessary to determine whether there was a missing link in its chain of custody because, even if its admission was error, it was harmless error under the facts of this case.
The appellant admitted in his statements, which were before the jury, that he had burglarized Sheila Rhodes's house and had stolen the specified items. In addition to the appellant's extrajudicial admissions, he admits in his brief on appeal that the events as shown by the evidence occurred. The admission of the card into evidence added nothing *466 of significance to the evidence against the appellant. "Errors, if any, in admitting fingerprint evidence to prove the accused's presence at the scene of the crime, are harmless where, as here, the accused's presence is undisputed and uncontradicted." Coulter v. State, 438 So.2d 336, 343 (Ala.Cr.App.1982), aff'd, 438 So.2d 352 (Ala.1983). See also Gardner v. State, 530 So.2d 250, 257 (Ala.Cr. App.1987), aff'd, 530 So.2d 258 (Ala.1988). As the Alabama Supreme Court stated in Ex parte Works, 640 So.2d 1056, 1059 (Ala.1994): "`The admission of incompetent evidence is harmless error where the fact to which such evidence relates is otherwise established by competent evidence.' Lawrence v. State, 409 So.2d 987, 989 (Ala.Cr.App.1982)."
The appellant also contends in a footnote in his brief to this court that several other unspecified items were likewise improperly admitted into evidence because of allegedly incomplete chains of custody. At trial, the appellant objected on the basis of chains of custody to those items as to which Investigator W.J. Watson was a link in the chain. He objected because Watson could not be located for trial because he was out of the country and, thus, he did not testify. We find no merit to this contention. Investigators Dorinda Hinton and Watson were charged with the responsibility of collecting evidence. They were partners and worked as a team. Although Watson did not testify, Hinton did. She testified that she and Watson collected the evidence together, secured and initialed the items, and delivered the items to the Alabama Bureau of Investigation and the Alabama Department of Forensic Sciences.

XIII.
The appellant contends that the prosecutor engaged in "extensive and prejudicial" misconduct in her closing arguments to the jury and on other occasions during the guilt phase of the trial. He urges us to reverse his convictions because of this alleged misconduct.

A.
Specifically, the appellant contends that the prosecutor wrongfully sought to inflame the jury by portraying the crime as a "racially motivated killing" and as being part of a "white supremacist conspiracy." He bases this contention upon the questions asked by the prosecutor to, and the testimony of, Officer Loebler, who arrested and questioned the appellant in Birmingham; the note left by the appellant on a mantle in the victim's home, indicating that the killing was the work of a gang or the result of gang activity, and the comments of the prosecutor in her closing arguments to the jury.
The appellant admitted to writing the note left on the mantle before shooting the victim and to designing it to make the police believe that the killing was the work of a gang. The note refers to "L.A. Crips" and to "skinheads," it contains gang symbols, and it is signed "Wesley Poole," who the appellant claimed in his statement is the head of the "Crips" in Los Angeles. The appellant claimed to know Poole and to have knowledge of gangs and their activities. The appellant also wrote on the note, "Yes, I'm proud to be black ya'll and that's a fact ya'll!" The appellant is white, and the victim was black.
Officer Loebler testified that she questioned the appellant at the police station in Birmingham after advising him of his rights. Over the objections of the appellant, she was permitted to read from her arrest report the details pertaining to his arrest and his statements to her. The report, which was signed by the appellant, was admitted into evidence. The report shows that the appellant admitted his involvement in the crimes and described what he had done in considerable detail. He stated, inter alia, that he broke into the victim's home to "get her back" for nearly hitting him with her automobile and that he left a note on the victim's mantle about "BASH," a Birmingham gang of skinheads.
After Officer Loebler finished reading from her arrest report, the record shows:
"Q. [Prosecutor:] Officer Loebler, I'd like to ask you about something specifically in the statement. Do you know what the reference to BASH, or capital B-A-S-H in quotation marks, is?
"A. Yes, I do.

*467 "Q. How are you familiar with that?
"A. We have a group of white males in Birmingham that are in a gang called skinheads and there is a specific branch of that in Birmingham called BASH. Birmingham Area SkinHeads. They are trained to kill minoritiesโ
"MR. LAWRENCE [defense counsel]: Object, Your Honor.
"THE COURT: Overruled.
"MR. LAWRENCE: Move to exclude.
"THE COURT: Overruled.
"A. They are trained to kill minorities and try to ambush or get people that are of minorities, specifically blacks, when they are not expecting it, and either harm or kill them."
The record shows further that, on cross-examination, Loebler testified as follows:
"Q. [Defense counsel:] You have no evidence whatsoever, do you, that this defendant, Mr. Knotts, is tied in with BASH, do you?
"A. Yes, I do. His confession.
"Q. You have no other independent evidence of any kind?
"A. No other, no, sir. Other thanโ
"Q. Other than what you just read?
"A. And also his hair. At that time they used very short cropped hair to identify themselves.
"Q. And you realize that he had been in Mount Meigs, do you not?
"A. Yes, I do.
"Q. But you have no evidence other than this statement you read, according to what you said, he had left a note on [the] victim's mantle about BASH. That's the entire basis of your statement; is that correct? You have no other independent evidence?
"A. None other than what he told me.
"Q. All right."
In her closing argument during the guilt phase, the prosecutor mentioned the note left on the mantle and gangs as follows:
"You see, he left behind a note.... He did it again. And in this note he talks about gangs. He mentioned the color red. He mentions something about L.A. and Crips and West Side Boys and there's diagrams here and Skinheads is on here and Wesley Poole. Now Wesley Poole, he says he knows Wesley Poole. He's a gang leader. Met him one timeโin his videotaped statement. And he knows an awful lot about guns and gangs and he leaves us that piece of evidence.
". . . .
"Defendant said he had left a note on [the] victim's mantle about "BASH" (the gang in Birmingham, Skinheads). The defendant signed this statement. It's right here. Lot of talk about gangs, lot of talk about guns.
". . . .
"This business about gangs. Now the defense would have you believe that the State of Alabama just made that up. We didn't insert gangs into this case. One person did. His name is William Thomas Knotts and he inserted it in the note he left at the house. The [victim's] house. He put it in there, not us. He is the one who discussed it. Listen to his words on the videotape. They're talking about the note. He says `I wrote the letter to throw them off.' Well now, pardon me, but isn't he just telling you that he wrote a lie if we believe him here? We know he's capable of lying, don't we? `So I wrote it to throw them off and I figured if I wrote the letter saying it was BGD and IGD and y'all had that and you'd think it was somebody in a gang that did it.' BGD? IGD? What is that? Well, he tells us. He saysโthese are his wordsโ'I know all the stuff that goes on in gangs. I know all their knowledge and all that `cause I've been around `em a long time.' That's not Ellen Brooks, that's the defendant.
"So on down. When did you write the note? Remember what he said? `In the beginning when I first got there.' Did he mean to kill her when he went in the house? Why did he write the note if he didn't? What else did you put on the note? `I put Skinheads.' Skinheads. Who is Wesley Poole?โOh, I'm sorry. Let me finish his answer. `Skinheads, underground or something like that. I wrote *468 something like that. Then I put Wesley Poole at the bottom.' Question: `Who is Wesley Poole? He's the president of IGD. How old a fella is he? Twenty-one. You know him? Know of him. Never seen him. I talked to him. He's from L.A.' You decide. You decide. Does he know anything about gangs? He introduced it. `So you planted the note? Yeah, to make it look like one of them, that Wesley Poole had done it. So at the time you planted the note you were planning to go through with killingโthe killing of this woman? At that time.' Now they tell you he's not totally truthfulโor excuse me, that the state would argue he's not totally truthful. They're right. They're absolutely right. How do I know that? Let's look. First of all he left a note that was false to the DYS, didn't he, about going to Dothan. He didn't go to Dothan, never intended to. To throw them off. Second one, left the note at the [victim's] house. It was a lie about the gangs, didn't he? Throw `em off. You see, he'll lie if it really helps him out."
Before the trial court's oral charge to the jury, the prosecutor, apparently because of concern that there would be possible error in the record, requested that the court instruct the jury to disregard any testimony of Officer Loebler relating to gang activities except what the appellant actually told Officer Loebler about the note he had written and about gangs. The appellant joined in the request. The trial court acceded to their request and instructed the jury as follows:
"Now I admitted some testimony into this trial as it relates to a statement made by the defendant as relates to gangs or BASH or Skinheads or Crips or Bloods, etc. Now I did not admit that testimony to prove the truth of the matter asserted therein, that is to prove the defendant's guilty of the crime that he's charged with. That evidence was admitted to show the true statement that the defendant gave and also his intent in throwing, as he's testified, the police off with the statement, the note that was left at the [victim's] house on the mantle piece, and to divert attention from where he was really going with the note about going to Dothan. So the evidence was not admitted to prove that this defendant was part of a gang or a member of a gang or the officer from Birmingham's testimony that came out during cross-examination as relates to her knowledge of gang activity, etc. So I'll instruct you to disregard that testimony as relates to gang activity as it relates or tries to connect the defendant with the defendant being a member of a gang. It's not admitted for that purpose, okay?"
The appellant did not object to this instruction.
The state contends that the testimony elicited from Officer Loebler concerning the meaning of "BASH," the propensity of its members to have their hair cut very short, and the purposes of the gang was relevant and was properly admitted into evidence under the facts of this case. We agree. In Alabama we have adopted a liberal test of relevancy. Under this test, a fact is admissible against a relevancy challenge if it has any probative value, however, slight, upon a matter in the case. C. Gamble, McElroy's Alabama Evidence ง 21.01 (4th ed. 1991). The trial court may exclude relevant evidence when it would serve comparatively little or no purpose except to arouse the passion, prejudice, or sympathy of the jury. Id. at ง 21.01(4).
Here, the appellant injected race into the case. In his admissions, he stated that the victim had called him a "honkey" and a "cracker" several days before the killing when she observed him and his companion near her home. In the note he left on the mantle, he tried to lead the authorities to think the crimes had been committed by blacks. Also by his note and his admissions, he injected gangs, skinheads, and the Birmingham skinhead gang known as BASH into evidence. It is apparent from the note and his admissions that he had considerable knowledge of gangs and gang activities. While the testimony of Officer Loebler explaining "BASH" was not responsive to the prosecutor's question, it aided the jury in understanding the meaning of the acronym used in the note. Moreover, it was admissible to show motive: the appellant's possible membership in an organization that espouses *469 racial hatred is relevant to a possible motive for the homicide. See Chambliss v. State, 373 So.2d 1185 (Ala.Cr.App.), cert. denied, 373 So.2d 1211 (Ala.1979) (motive for a homicide is always a proper subject of inquiry).
Even if we were to conclude that the admission of Officer Loebler's testimony in this regard was error, in our opinion, it would be harmless. After finding either an error affecting a constitutional right or an error not affecting a constitutional right, an appellate court may still affirm a conviction on the ground that the error was harmless. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Guthrie v. State, 616 So.2d 914 (Ala.Cr.App.1993); Sattari v. State, 577 So.2d 535 (Ala.Cr.App.1990), cert. denied, 577 So.2d 540 (Ala.1991); Ala. R.App.P. 45. The harmless error rule applies in capital cases. Ex parte Whisenhant, 482 So.2d 1241 (Ala.1983); Guthrie v. State. The purpose of the rule is to avoid setting aside convictions for small errors or defects that have little, if any, likelihood of changing the result of the trial. Chapman v. California.
In determining whether, under the facts and circumstances of this case, the admission of the testimony of Officer Loebler concerning the gang known as BASH was harmless, we look to the standards set forth in Chapman v. California and Ala.R.App.P. 45. In order for an error affecting a constitutional right to be deemed harmless under Chapman, the state must prove beyond a reasonable doubt that the error did not contribute to the verdict. In the case of an error not affecting a constitutional right, the appellate court must determine with "fair assurance ... that the judgment was not substantially swayed by the error." Kotteakos v. United States, 328 U.S. 750, 764-65, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). See also United States v. Hawkins, 905 F.2d 1489 (11th Cir.1990), cert. denied, 498 U.S. 1038, 111 S.Ct. 707, 112 L.Ed.2d 696 (1991) (error harmless unless reasonable likelihood that it affected defendant's substantial rights). In order for error to be deemed harmless under Rule 45, the state must establish that the error did not or probably did not injuriously affect the appellant's substantial rights.
In this case, assuming that there was error, it was an error that did not affect the appellant's constitutional rights. Applying the harmless error analysis prescribed by the cases cited above and Ala.R.Cr.P. 45 to this issue, in the light of the entire record, we find that the verdicts of guilty were not substantially swayed or affected by error in this regard and that any error did not injuriously affect the appellant's substantial rights. Our finding that any error was harmless is supported by the trial court's instruction to the jury not to consider any of Officer Loebler's testimony concerning gangs or possible gang membership and to consider only what the appellant had said relative to gangs and gang activity. As we stated above, the appellant did not object to the instruction and, in fact, joined the prosecution in requesting it. We believe that the instruction cured any error that may have been committed by admitting the testimony of the officer.
We have reviewed the comments of the prosecutor in her closing argument to the jury in reference to the note left on the mantle and the appellant's statements in reference to gangs, and find no error. The prosecutor's comments are legitimate comments on the evidence admitted in the case. In argument to the jury, counsel may not state facts not in evidence, but may comment on reasonable inferences from the evidence and may draw conclusions from the evidence based on counsel's own reasoning. Twilley v. State, 472 So.2d 1130 (Ala.Cr.App.1985).

B.
The appellant contends that the prosecutor engaged in prejudicial misconduct by telling the jurors to imagine that they were the victim and her child. He argues that the prosecutor, by sensationalizing the crime in her closing argument in the guilt phase, directed the jury's attention from the issue of whether the appellant was guilty of capital murder and urged it to convict him out of empathy for the victim and her son and out of fear of becoming a victim of such a crime themselves. While the appellant calls our attention to several instances which he claims constituted misconduct by the prosecutor, *470 he quotes only one portion of the argument in his brief, as follows:
"Can you imagine the little boy in this shirt, hearing the first shot, running to his mother, seeing her on the ground. Can you imagine? Can you imagine what it was like for that little boy? Can you imagine what it was like for momma in her dying last seconds, conscious, conscious on that floor there with the pain of the first bullet, with the pain of the second one that nearly went all the way through her, puncturing both lungs and the aorta, wondering in her last moments what must have seemed like an eternity to her. `Will my little boy be all right?' Unable to do anything about it."
We note that there was no objection to the quoted comments in the trial court. While the failure to object does not preclude review in a capital case, it does weigh against any claim of prejudice. Ex parte Kennedy, 472 So.2d 1106 (Ala.1985), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985). Under a different set of facts, comments such as these, referring to the child's perspective on the crime, could be calculated to inflame and prejudice the jury and thus they would be highly questionable. However, under the facts of this case, we have no doubt that they did not so affect this jury, as especially illustrated by its recommendation that the appellant be sentenced to life imprisonment without the possibility parole. Even if the comments constituted error, they certainly would not rise to the level of plain error.
The appellant contends that error occurred when the prosecutor elicited testimony from the victim's husband during the guilt phase about the victim's child experiencing nightmares since his mother's death. The record shows the following:
"Q. Was your son able to talk to you at all about what happened?
"A. No, not directly. He would say certain things, but ...
"Q. Has he ever been able to tell you what happened that night?
"MR. LAWRENCE [defense counsel]: Your Honor, we object to anything.
"THE COURT: Overruled. She didn't ask him to tell her what he said, she just asked him has he ever been able to tell her.
"A. No. He just had nightmares.
"MR. LAWRENCE: Judge, we object.
"THE COURT: He hasn't told, he hasn't said anything the child said.
"MR. LAWRENCE: No, sir. The responseโthe answer was unresponsive to the question.
"THE COURT: Overruled.
"MR. LAWRENCE: He said no.
"THE COURT: Overruled.
"MR. LAWRENCE: We ask that the response beyond no be stricken from the record.
"THE COURT: Overruled. Next question."
We find this testimony objectionable on grounds of hearsay and relevancy. The objection should have been sustained and the response excluded. However, the error was harmless. It was so minor that it could not have affected the results of the trial under Chapman v. California and Ala.R.Cr.P. 45.

C.
The appellant contends that error occurred when the prosecutor argued to the jury during the guilt phase that the appellant had attempted to shoot the victim's two-year-old son. He argues that the prosecutor, in doing so, sought to inflame the jury by diverting its attention from the issue of the appellant's guilt or innocence of the offenses charged to the attempted murder of the child, for which the appellant had not been charged. We do not agree. The evidence showed that three bullets were fired in the victim's home at the time of the killing. The first two bullets, fired from the derringer struck the victim, and the third bullet, fired from a different pistol, lodged about two feet from the floor in a wall between the living room and kitchen. The bullet had apparently been fired toward the hallway in a downward angle in the direction from which the child had come when he ran into the living room. The appellant never mentioned this third shot in his statements to the police.
*471 We conclude, after reviewing the evidence, that the comments of the prosecutor that the appellant had fired the third bullet at the child are reasonable inferences that could be drawn from the evidence. The trial court in its summary of the crime and the appellant's participation in it, which is a part of the court's sentencing order, found in reference to the third bullet, "Circumstantially, it is reasonable to conclude that it had been fired at Darius [the victim's child]." We agree with this finding.
The appellant also contends that the prosecutor, in arguing that the third bullet was fired at the child, erroneously injected an uncharged offense into the case. We find no merit in this contention. The evidence pertaining to the third bullet was admissible as part of the res gestae of the crime, and it was proper for the prosecutor to argue any reasonable inferences which could be drawn from such evidence. Lyde v. State, 605 So.2d 1255 (Ala.Cr.App.1992); Rutledge v. State.

XIV.
The appellant contends that the evidence was insufficient to sustain his conviction for the capital crime of murder-robbery. He argues that the theft of property from the victim's home occurred before the killing and that the theft of her automobile occurred after the killing, and were therefore "entirely unrelated" to the killing. He argues that he had already taken shoes, clothing, and other items from the victim's residence at the time of the shooting and that the killing was in no way related to in the commission of that theft or the flight from such theft. He further argues that the theft of the victim's automobile was a "mere afterthought" following the shooting, and that the victim was not killed in order to obtain the automobile. We find no merit in this contention.
The capital crime of the intentional killing of the victim during a robbery is a single offense beginning with the act of robbing or attempting to rob and culminating in the act of intentionally killing the victim. The offense consists of two elements, robbing and intentional killing. Davis v. State, 536 So.2d 110 (Ala.Cr.App.1987), aff'd, 536 So.2d 118 (Ala.1988), cert. denied, 490 U.S. 1028, 109 S.Ct. 1766, 104 L.Ed.2d 201 (1989); Magwood v. State, 494 So.2d 124 (Ala.Cr.App. 1985), aff'd, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986).
"As the Alabama Supreme Court held in Cobern v. State, 273 Ala. 547, 142 So.2d 869 (1962), `the fact that the victim was dead at the time the property was taken would not militate [against a finding] of robbery if the intervening time between the murder and the taking formed a continuous chain of events.' Clements v. State, 370 So.2d 708, 713 (Ala.Cr.App.1978), affirmed in pertinent part, 370 So.2d 723 (Ala.1979); Clark v. State, 451 So.2d 368, 372 (Ala.Cr. App.1984). To sustain any other position `would be tantamount to granting to would-be robbers a license to kill their victims prior to robbing them in the hope of avoiding prosecution under the capital felony statute.' Thomas v. State, 460 So.2d 207, 212 (Ala.Cr.App.1983), affirmed, 460 So.2d 216 (Ala.1984).
"Although a robbery committed as a `mere afterthought' and unrelated to the murder will not sustain a conviction under ง 13A-5-40(a)(2) for the capital offense of murder-robbery, see Bufford v. State, [382 So.2d 1162 (Ala.Cr.App.), cert. denied, 382 So.2d 1175 (Ala.1980)]; O'Pry v. State, [642 S.W.2d 748 (Tex.Cr.App.1981)], the question of a defendant's intent at the time of the commission of the crime is usually an issue for the jury to resolve. Crowe v. State, 435 So.2d 1371, 1379 (Ala.Cr.App. 1983). The jury may infer from the facts and circumstances that the robbery began when the accused attacked the victim and the capital offense was consummated when the defendant took the victim's property and fled. Cobern v. State, 273 Ala. [at] 550, 142 So.2d [at] 871 ... (1962). The defendant's intent to rob the victim can be inferred where `[t]he intervening time, if any, between the killing and robbery was part of a continuous chain of events.' Thomas v. State, 460 So.2d at 212.... See also Cobern v. State; Crowe v. State; Bufford v. State; Clements v. State."
Hallford v. State, 548 So.2d 526, 534-35 (Ala. Cr.App.), aff'd, 548 So.2d 547 (Ala.), cert. *472 denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989) (quoting Connolly v. State, 500 So.2d 57, 63 (Ala.Cr.App.1985), aff'd, 500 So.2d 68 (Ala.1986).
It can reasonably be inferred from the evidence in this case that the robbery and murder formed a continuous chain of events. When the appellant escaped from the juvenile detention facility, he carried with him a screwdriver and a pair of gloves. He intended to use the screwdriver to break into and steal an automobile. Before entering the victim's house, he stole a pistol from Ware's residence. He stated that he intended to use this pistol to "scare" someone out of an automobile. After breaking into the victim's house, he collected several items that he intended to steal and waited for the victim to return. When she returned, he killed her; took the keys to her automobile, her credit cards, other items he had collected in her home, and her automobile; and then fled. It is reasonable to infer from the evidence that the appellant intended to steal the victim's automobile when he entered her home. From the time the appellant entered the victim's home until he fled in her automobile, although a considerable period of time elapsed, his conduct was one continuous chain of events. There was more than sufficient evidence from which the jury could find that the appellant murdered the victim during a first degree robbery, and that he had the intent to commit this capital offense.

XV.
The appellant contends that it was error for the trial court to allow the victim's husband to sit at the prosecution's counsel table during the trial. Alabama courts have clearly decided this issue adversely to the appellant. See Harris v. State, 632 So.2d 503 (Ala.Cr.App.1992), aff'd, 632 So.2d 543 (Ala.1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995). The appellant also claims that it was error to allow the other victims, who were also witnesses, to be seated in the front row of the audience. There is no merit to this claim. Even though they were witnesses in the case, they had the right to hear all testimony firsthand, because they were also victims in the case. Loper v. State, 469 So.2d 707 (Ala.Cr.App.1985). The appellant argues that the trial court employed a double standard because it refused to allow his brother or the defense investigator to sit at the defense table or to remain in the courtroom. The appellant was not entitled to have either sit at the defense table or to remain in the courtroom. It was entirely within the trial court's discretion, and we find no abuse of that discretion. In regard to the appellant's claim that he was prejudiced when "several of the victim's relatives began sobbing at one point near the start of the trial, in full view of the jury," we find no merit in his claim. As the attorney general points out, this claim is not supported by the record. There is no evidence that the victim's relatives were displaying emotion in the presence of the jury.

XVI.
The appellant contends that his constitutional rights were violated during the penalty phase of the trial by the trial court's communicating with the jury outside the presence of the appellant and his counsel. He bases this contention on a statement by the trial court to the parties, out of the presence of the jury, during the sentencing phase when a discussion was being held about the playing of a videotaped recording. The statement is as follows:
"Well, what I want this morningโlet me tell you what I want. I want some live witnesses put on this stand so we can move this case ahead. They have sent me that message. They are tired. They feel that this case is being strung out. They feel we are wasting a lot of time. I want some live witnesses and we'll deal with the tape some other time later in the middle of the day, okay? Now, I'm ready for a witness this morning."
No objection was made as to any ex parte communication or contact between the trial court and the jury; thus, the record does not disclose how the trial court received the information, assuming that it did. This issue is raised for the first time on appeal.
Any clue as to how and under what circumstances the trial court received the message must be gleaned from the court's comment *473 itself. The comment does not indicate that the trial court spoke with or had personal contact with the jury. It is possible that the jury sent a written message as it had done several times during the trial when it advised the court that it wanted to work on weekends, that defense counsel could not be heard, and that witnesses could not adequately be seen when they were testifying. It is possible that the jury sent an oral message to the trial court. It is also possible that the trial court had no indirect communication from the jury at all, but based its comments on what it perceived by observing the demeanor of the jurors in the jury box. It is impossible to determine from the record what actually happened. We are left to speculate.
It is important to note that the discussion was held and the trial court's statement was made during the sentencing phase. The jury had only two sentencing options: life imprisonment without the possibility of parole or deathโand the jury recommended life imprisonment without the possibility of parole. Even if ex parte communication occurred, because the jury recommended life imprisonment without the possibility of parole, the appellant could not have been prejudiced.
Under these circumstances we cannot find error, much less plain error.

XVII.
The appellant contends that the trial court erred in ordering him to provide the state with summaries of the expected testimony of his expert witnesses and with reports from defense experts on matters that would not otherwise be reported in a report covered by Rule 16.2(c). He argues that this broad discovery requirement "abridged work-product and attorney-client privileges" in violation of his constitutional rights. He does not identify the witnesses whose testimony he claims he was required to summarize. It appears from the following except from the record that he was ordered to produce a summary of the testimony of only one witness.
"MS. BROOKS [the prosecutor]: Your Honor, just to clarify about discovery ... out of an abundance of caution, I would just ask if the court would allow us to determine whether or not he intends at this point to call any of these experts he has gotten money to hire, such asโ
"THE COURT: I have approved money for someone out of Seattle, Washington, I believe, to bring them in. Do you have records from those witnesses, Mr. Lawrence [defense counsel], that you are going to use, on those witnesses?
"MR. LAWRENCE: She has the record on John Walters.
"THE COURT: All of the experts.
"MS. BROOKS: How about the criminologist?
"MR. LAWRENCE: You have that. Oh, the criminologist. There is no report.
"THE COURT: Okay.
"MS. BROOKS: Could we request that the expert, if he expects to call him, reduce to writing whatever he expects his opinion to be.
"THE COURT: That's the rule.
"MR. LAWRENCE: Is that necessary, Your Honor?
"THE COURT: Yes. You have to give them an understanding of [what] he is going to testify about and what his opinion is, so have that by the 16th.
The appellant failed to object to having to produce the summary. We note that this portion of the record does not support the appellant's claim that the defense was required to produce any report of previously unreported work of any defense expert. The state contends that the order to produce a written summary of the anticipated testimony of the expert was proper under Ala. R.Crim.P. 16.2. We do not read the rule so broadly: in our opinion, the requirement that the defense prepare and deliver to the state a summary of the anticipated testimony of one of its witnesses goes beyond the scope of the rule.
There is no constitutional right in this state to discovery in a criminal case. Discovery in a criminal case is governed in Alabama by Rule 16. Jefferson v. State, 645 So.2d 313 (Ala.Cr.App.1994). Rule 16.2(a) provides,

*474 "Upon written request of the state/municipality, the defendant shall ... for good cause shown, permit the state/municipality to analyze, inspect, and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or portions of any of these things, which are within the possession, custody, or control of the defendant and which the defendant intends to introduce in evidence at the trial."
Rule 16.2(c) provides,
"Upon written request of the state/municipality, the defendant shall ... for good cause shown, permit the state/municipality to inspect and to copy any results or reports of physical or mental examinations, and of scientific tests or experiments, made in connection with the particular case, which are within the possession or control of the defendant and which the defendant intends to introduce in evidence at the trial or which were prepared by a witness whom the defendant intends to call at the trial, if the results or reports relate to the witness's testimony."
Clearly, Rule 16 allows access to reports that the defendant intends to introduce at trial or that were prepared by a witness whom the defendant intends to call to testify at trial. However, the rule does not state that an expert witness can be required to make a report at the request of an opposing party. Such a requirement would go beyond the boundaries of the rule. The Supreme Courts of Idaho and Washington, in applying similar criminal discovery rules to identical factual situations, have reached the same conclusion. State v. Rhoades, 120 Idaho 795, 820 P.2d 665 (1991), cert. denied, 504 U.S. 987, 112 S.Ct. 2970, 119 L.Ed.2d 590 (1992); State v. Hutchinson, 111 Wash.2d 872, 766 P.2d 447 (1989). Cf. Kirkpatrick v. State, 574 So.2d 1025 (Ala.Cr.App.1990).
Thus, the trial court's order in this case, ordering the appellant to produce for the state a summary of the expected testimony of its expert witness, was error; however, because no objection was made to this order, we must review it under the plain error rule. The record does not reveal the identity of the criminologist whose expected testimony was to be summarized and produced; the record does not even reveal if the summary was ever prepared and provided. We note that a criminologist Thomas Petee testified at length for the appellant in the sentencing phase of the trial. In substance, he testified that the family environment in which the appellant was raised could encourage the development of criminal tendencies. Upon these facts, from the record before us, we cannot see how the erroneous order harmed or prejudiced the appellant in any way. Moreover, he does not tell us how he was prejudiced by the order. We conclude that the order could not have reasonably affected the fairness or integrity of the trial, nor did it deprive the appellant of a substantial right. We find no plain error here.

XVIII.
The appellant contends that, at the guilt phase, the trial court committed reversible error when it admitted into evidence, over his objections, autopsy photographs of the victim, in which her body had been altered so as, he argues, to highlight her injuries and also photographs before and after she was killed that contrasted her appearance when alive with her dead body. He asserts that the photographs were highly prejudicial and were unnecessary to prove any element of the prosecution's case against him.
As this court stated in Magwood v. State, 494 So.2d 124, 141 (Ala.Cr.App.1985), aff'd, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986):
"As a general rule, photographs are admissible in evidence if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973); Hopkins v. State, 429 So.2d 1146 (Ala.Crim.App.), cert. denied, 429 So.2d 1146 (Ala.1983); Godbolt v. State, 429 So.2d 1131 (Ala.Crim.App.1983 [1982]); Carpenter v. State, 400 So.2d 417 (Ala. Crim.App.), cert. denied, 400 So.2d 427 *475 (Ala.1981). Photographs which depict the character and location of external wounds on the body of a deceased are admissible even though they are cumulative and based upon undisputed matter. Wicker v. State, 433 So.2d 1190 (Ala.Crim.App.1983); Hopkins v. State; Hines v. State, 365 So.2d 320 (Ala.Crim.App.), cert. denied, 365 So.2d 322 (Ala.1978). The fact that a photograph is gruesome and ghastly is no reason to exclude its admission into evidence, if it has some relevancy to the proceedings, even if the photographs may tend to inflame the jury. Warrick v. State, 460 So.2d 320 (Ala.Crim.App.1984); Carpenter v. State; Richards v. State, 337 So.2d 171 (Ala.Crim.App.), cert. denied, 337 So.2d 173 (Ala.1976)."
The trial court did not abuse its discretion in admitting these photographs into evidence. The photographs depicted, among other relevant and material facts, the location of the gunshot wounds and the direction and angle from which they were fired. The photographs shed light on and helped explain the locations and actions of the victim as well as the appellant at the time the shots were fired. The photographs had a reasonable tendency to prove or disprove material facts in issue and were highly relevant. The photograph taken of the victim before she was murdered was properly admitted into evidence. See Jolly v. State, 395 So.2d 1135 (Ala.Cr.App.1981).
The appellant further asserts that the trial court erred when it admitted into evidence a photograph of the victim's two-year-old son; the clothes that he was wearing at the time of the offenses; and his toy recovered at the scene. He contends that evidence of the photograph, the clothes, and the toy was irrelevant and that its admission served only to inflame the jury. The trial court admitted the photograph of the victim's son, who was present when his mother was killed, because it tended to prove the child's age and size at the time of the offenses. There was a dispute as to whether a third shot was fired at the child. Evidence of the age and size of the child would aid the triers of fact in making that determination. We find no abuse of discretion here. Further, we find that the trial court did not abuse its discretion when it admitted the child's toy and clothes because they tended to illustrate the condition and location of the scene where the victim's body was found.

XIX.
The appellant contends that the state failed to prove that he committed burglary in the first degree of the home of Sheila Rhodes because the state failed to offer any evidence that he was armed at the time of that offense. He concedes that there was proof that he had stolen a .22 caliber gun from Ware's home, but he asserts that there was no proof that that theft took place before the burglary of Sheila Rhodes's home or that he took the gun with him when he entered her home.
The state did not have to prove that, at the time of his entry to Sheila Rhodes's home, the appellant was armed with the weapon taken from the Ware residence. Section 13A-7-5 does not require the prosecution necessarily to show that the burglar was armed before to the entry of the dwelling; it suffices for the prosecution to prove that the burglar was armed while in the dwelling. Pardue v. State, 571 So.2d 333 (Ala.1990). In the appellant's own statement to the police, he admitted that he had broken into Sheila Rhodes's home where he took a number of items, including guns, ammunition, coins, and a black bag; and that had he put the guns, ammunition, and coins in the bag.
Moreover, when the appellant was arrested, the three guns from Sheila Rhodes's home were recovered from the stolen automobile. Pursuant to Pardue, this evidence was certainly sufficient to support the jury's verdict finding the appellant guilty of burglary in the first degree, particularly the element that he was armed with a deadly weapon. In other words, by stealing the guns from Sheila Rhodes's home, the appellant armed himself while in the dwelling. See also Evans v. State, 568 So.2d 878 (Ala.Cr. App.1990).

XX.
The appellant contends that the circuit court did not have jurisdiction to indict *476 and try him for murder-robbery because in his delinquency petition he was charged only with murder-burglary. He contends that it was error to try him for an offense in circuit court that he had not been charged with in his delinquency petition. We have previously held that it is not error for a defendant to be indicted for an offense different from the offense charged in his delinquency petition, so long as the indicted offense is based on behavior arising out of the same transaction upon which the delinquency petition charge was based. Tolbert v. State, 598 So.2d 1011 (Ala.Cr.App.1991); Kinder v. State, 515 So.2d 55 (Ala.Cr.App.1986). In other words, the circuit court to which the case is transferred is limited to the consideration of the specific acts, behavior, or subject matter of the petition, but it is not limited to the specific named offense. In this case, the fact that the appellant was charged with murder-burglary in his delinquency petition did not prevent his indictment for murder-robbery after his transfer to circuit court, because the new charge arose out of the same behavior or transaction. There is no merit in the appellant's contention.
In a footnote, the appellant contends that several of the remaining indictments differed from the delinquency petitions. Likewise, there is no merit to the appellant's contention that these differences affected the circuit court's jurisdiction.

XXI.
The appellant argues that the trial court erred in failing to remove several veniremembers for cause. In Morrison v. State, 601 So.2d 165, 168 (Ala.Cr.App.1992), this court held:
"The qualification of prospective jurors rests within the sound discretion of the trial court. Ex parte Cochran, 500 So.2d 1179, 1183 (Ala.1985); Alabama Power Co. v. Henderson, 342 So.2d [323] at 327 [(Ala. 1976)]. A judge's decision on a challenge for cause `is entitled to great weight' and will not be disturbed on appeal `unless clearly erroneous, equivalent to an abuse of discretion.' Brownlee v. State, 545 So.2d [151, 164 (Ala.Cr.App.1988)]. In reviewing a trial court's decision on a challenge for cause, `this court will look to the questions propounded [to] and the answers given by the prospective juror to see if [the trial court's] discretion was properly exercised.' Alabama Power Co. v. Henderson, 342 So.2d at 327. Accord Ex parte Cochran, 500 So.2d at 1183-84. These questions and answers must be viewed as a whole and not in isolation. See Ex parte Rutledge, 523 So.2d 1118, 1120 (Ala.1988); Ex parte Beam, 512 So.2d 723, 724 (Ala. 1987)."
We will consider separately the grounds on which the appellant alleges error.

A.
The appellant argues that the trial court erred by not excusing veniremember number 3 for cause. At the time of the trial, this veniremember was employed as an assistant United States Attorney. The appellant argues that the trial court should have excused her for cause because of the nature of her employment and because of two statements she made. Specifically, the appellant complains of the following statements she made in response to voir dire questioning: "it always has raised a question in my mind when the defendant did not testify," and "[i]t would be difficult to restrain myself" from giving legal advice during jury deliberations. However, during a probing individual voir dire examination, this potential juror also stated that "by nature and by training, [she is] supposed to evaluate everything in fairness to all parties"; that she would be able to apply the law as instructed by the trial court; and that she would "base [her] verdict solely on the facts and law as given to [her] by the court."
The appellant argues that the veniremember's statements were equivocal and that this equivocation, combined with her employment, indicates "probable prejudice" on her part. Wood v. Woodham, 561 So.2d 224 (Ala.1989). We disagree. The tenor of this potential juror's responses was not a vacillating uncertainty comparable to the responses of the potential jurors in Wood. This veniremember answered candidly, and showed that despite possible instinctive yearnings to the contrary, she fully understood *477 the duties of a juror and was capable of fulfilling them. Furthermore, a veniremember's occupation does not indicate that that person is biased against the defendant, and "falls far short of reasonably creating any disqualification." Finley v. State, 36 Ala. App. 56, 57, 52 So.2d 167, 167 (1951).
The appellant did not move to have this veniremember excused for cause; therefore, our review of this issue is pursuant to the doctrine of plain error. "By failing to object, the defendant has not waived this issue, although the failure to object does `weigh against Defendant as to any possible claim of prejudice,' Ex parte Bush, 431 So.2d 563, 565 [(Ala.), cert. denied, 464 U.S. 865 [104 S.Ct. 200, 78 L.Ed.2d 175] (1983)]." Kuenzel v. State, 577 So.2d 474, 523 (Ala.Cr.App.1990). Viewing this potential juror's responses to voir dire examination in their totality, we find that the trial court did not abuse its discretion by not sua sponte removing this juror for cause.

B.
The appellant contends that veniremember number 31 should have been excused for cause because during voir dire he expressed his agreement with the proposition that "officers of the law" are more inclined to tell the truth than other people and stated that he might give more weight to testimony from a law enforcement officer than to that of another witness. As stated above, in order to warrant a reversal, the trial court's decision of whether to dismiss a veniremember for cause must be clearly erroneous. Morrison, supra. After a review of the voir dire questions and answers as a whole, we hold that the trial court's decision not to excuse this veniremember for cause was not clearly erroneous. Brown clearly indicated that if he were to serve on the jury, he would follow the court's instructions to consider all the evidence in the case without excluding any evidence.
In a footnote to his brief to this court, the appellant contends that the trial court erred by failing to excuse veniremember number 45 who is a police officer and whose father-in-law is an employee of the attorney general's office. The appellant contends that this veniremember received "prejudicial pretrial information" from his father-in-law. Although his father-in-law did tell this venireperson what he knew about the case, this veniremember received no more and maybe less information about the case than was disseminated through the media. Furthermore, he clearly stated that he could render a fair verdict in this case and that information he received from his father-in-law had not given him a preconceived notion as to the guilt or innocence of the appellant. The trial court's decision not to excuse this veniremember for cause was not clearly erroneous.

C.
The appellant argues that the trial court erred by excusing veniremembers 31, 38A, 46A, 89, 96, and 115, because, the appellant contends, they stated that they could not properly consider mitigating factors and would be prone to automatically impose the sentence of death. In Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Supreme Court held that a veniremember may be excused for cause if the trial court has reason to believe that that veniremember's personal views would impair the veniremember's ability to apply the law to the facts as instructed by the court.
Veniremember 31 stated that he would have to hear both sides before he could decide whether death or life imprisonment without the possibility of parole would be the appropriate sentence. He also stated that he could apply the law as instructed by the trial court.
On veniremember 38A's voir dire examination, the appellant asked her whether she would automatically impose the death penalty if the state met its burden in proving intentional murder. She responded that she would, if convinced "beyond any doubt." However, the prosecutor then asked her whether she would consider mitigating circumstances if instructed to do so. This was the only time this veniremember was questioned on the consideration of mitigating circumstances, and she answered that she could consider them. She also stated that she *478 would follow the instructions of the court, and that her personal feelings would not interfere with her ability to apply the law as she was instructed.
Veniremember 46A was asked several confusing questions regarding his ability to weigh the mitigating factors, and he responded to these confusing questions with equivocal answers. The prosecutor finally asked this veniremember the question in clear terms, and the veniremember responded, unequivocally, that he could weigh the mitigating circumstances as instructed by the trial court. This veniremember also stated that he did not believe in the "eye for and eye and a tooth for a tooth concept."
Veniremember 89 did initially express her dislike for having to consider certain specified facts as mitigating circumstances. However, she further indicated that she would consider the mitigating circumstances as instructed by the trial court.
Veniremember 96 stated that if the defendant were convicted of capital murder, but the facts did not warrant the death penalty, he would be able to impose the sentence of life imprisonment without the possibility of parole.
On voir dire examination, veniremember 115 first indicated uncertainty about Alabama's bifurcated capital trial procedure, and he gave answers that seemed contradictory to different questions regarding the consideration of mitigating circumstances. However, after the trial court explained the bifurcated trial procedure, this veniremember stated that he could balance the aggravating and mitigating circumstances before deciding which sentence would be appropriate.
Applying the Wainwright v. Witt standard to these veniremembers' answers, we find that the trial court did not err by failing to excuse these veniremembers for cause. Furthermore, even if the trial court erred in failing to remove any of these allegedly pro-death penalty veniremembers, the appellant would not have been prejudiced because the jury recommended a sentence of life imprisonment without the possibility of parole.
The appellant raises two additional issues in footnotes to his brief. He does not cite any legal authority in support of these contentions, and we find that they are without merit. The appellant first contends that the trial court erred by refusing to allow him to ask veniremember 4 whether she would automatically impose the death penalty in a case of premeditated murder. We first note that the appellant was allowed to ask her whether she would vote for the death penalty in a case of premeditated murder, and she was allowed to answer. Furthermore, premeditation is not an element of capital murder; therefore, this question was not relevant to the facts of this case. We find no error in the trial court's ruling on this issue.
The appellant's second contention is that the court erred in not allowing the appellant to examine the veniremembers on the question of whether they would be prejudiced by gruesome photos. In ruling on this issue, the trial court observed that this question speculated as to what evidence might be introduced at trial, and that it was unknown which evidence would actually be introduced at trial. Therefore, the trial court disallowed this question as irrelevant. We find no error in the trial court's decision.

XXII.
The appellant complains that the trial court erred by granting the state's challenge for cause of veniremember 92. Under the principles of Morrison v. State, 601 So.2d 165, 168 (Ala.Cr.App.1992), set out in part XXI of this opinion, we find no abuse of the trial court's discretion here.
The trial court granted the state's challenge for cause as to this veniremember for two reasons. First, she stated that she had read and heard about the case, that she had formed an opinion about the appellant's guilt, and that what she had read and heard would affect her judgment.
"`A fundamental principle of due process requires that the jury's verdict be based on evidence received in open court, not from outside sources. Sheppard v. Maxwell, 384 U.S. 333 [86 S.Ct. 1507, 16 L.Ed.2d 600] ... (1966); Irvin v. Dowd, 366 U.S. 717 [81 S.Ct. 1639, 6 L.Ed.2d 751]... (1961). A juror's impartiality is not *479 necessarily destroyed when he is exposed to pretrial publicity. "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Irvin v. Dowd, 366 U.S. at 723 [81 S.Ct. at 1643...; see Calley v. Callaway, 519 F.2d 184, 205-06 (CA5, 1975) (en banc), cert. denied, 425 U.S. 911 [96 S.Ct. 1505, 47 L.Ed.2d 760] ... (1976). But when a juror is exposed to potentially prejudicial pretrial publicity, it is necessary to determine whether the juror can lay aside any impression or opinion due to the exposure. The juror is poorly placed to make a determination as to his own impartiality. Instead, the trial court should make this determination.'"
Brown v. State, 571 So.2d 345, 349-50 (Ala. Cr.App.1990), cert. quashed, 571 So.2d 353 (Ala.1990), vacated on other grounds, 501 U.S. 1201, 111 S.Ct. 2791, 115 L.Ed.2d 966 (1991) (quoting United States v. Davis, 583 F.2d 190, 197 (5th Cir.1978)). Clearly, the trial court was within its discretion in determining that this veniremember could not render an impartial verdict, and it properly granted the challenge for cause based on this reason. The second reason that the trial court granted the challenge of this veniremember is that she also stated that she could not vote for the death penalty in this case. At first glance, it appears that the veniremember gave conflicting answers regarding her ability to vote for the death penalty; however, upon a reading of the entire voir dire of this veniremember, we note that in those instances when she was questioned as to whether she could vote for the death penalty in this case, she responded that she could not vote for death and that she would vote for life imprisonment without the possibility of parole. When she was questioned as to whether there might be other cases or circumstances in which she could vote for the death penalty, she responded that she might be able to so vote. The trial court properly granted the challenge for cause on this ground also. See Crawford v. State, 377 So.2d 145 (Ala.Cr.App.), aff'd, 377 So.2d 159 (Ala.1979), vacated on other grounds, 448 U.S. 904, 100 S.Ct. 3044, 65 L.Ed.2d 1134 (1980).
The appellant raises an issue in footnote 105 to his brief regarding veniremember 20. He claims that the trial court erred in refusing to permit him to question this veniremember on voir dire examination so that he could attempt to rehabilitate her after she had stated her opposition to the death penalty in response to allegedly leading questions by the prosecution. The record does not support these contentions. The prosecutor asked no questions of this veniremember. All the questions were asked by the trial court, and they were clear, concise, and in no way misleading. The veniremember responded that on personal and religious grounds she would not vote for the death penalty under any circumstances. The trial court did not refuse to permit the appellant to question this veniremember, as he alleges. The prosecutor's objection to one question asked by the appellant was properly sustained by the trial court because it was confusing.
The appellant raises other issues in footnote 106 to his brief. He claims that his rights were violated when the court administrator excused two veniremembers outside the presence of the court and of the parties and without the appellant's consent. When the matter of the excusal of these two veniremembers and their replacements arose in preliminary proceedings, no objection was made by the appellant. We find no error. Under the circumstances here, the granting of the excuses of the two veniremembers by the court administrator was proper. See Windsor v. State, 683 So.2d 1021 (Ala.1994). See also ง 12-16-145. Nothing was presented by the appellant to indicate that the correct statutory procedure was not followed in excusing these two veniremembers; thus, it is presumed that the proceedings were proper. In the absence of a showing to the contrary, it is presumed that court proceedings are regular and proper, that the trial court has properly discharged its duties, and that it has observed all the necessary formalities imposed on it by law. Allison v. State, 645 So.2d 358 (Ala.Cr.App.1994); R. Williams, Williams's Alabama Evidence, ง 41 (1967).
*480 The appellant also complains of the removal of veniremember 32 from the venire by the use of a "court strike." Because there was an odd number of veniremembers remaining on the venire, the trial court removed veniremember 32 by random selection to facilitate the striking process. No objection was raised at the time by the appellant. This does not constitute plain error.

XXIII.
The appellant contends that the trial court erred in denying his motion for a change of venue. As grounds for his motion, the appellant argued that the pretrial publicity in connection with this case was extensive; therefore, he argued, there was a substantial likelihood that this jury was prejudiced against him.
In Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985), the Alabama Supreme Court held:
"Absent a showing of abuse of discretion, a trial court's ruling on a motion for a change of venue will not be overturned. Ex parte Magwood, 426 So.2d 929, 931 (Ala.), cert. denied, 462 U.S. 1124 [103 S.Ct. 3097, 77 L.Ed.2d 1355] ... (1983). In order to grant a motion for change of venue, the defendant must prove that there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity. Sheppard v. Maxwell, 384 U.S. 333 [86 S.Ct. 1507, 16 L.Ed.2d 600] ... (1966); Franklin v. State, 424 So.2d 1353 (Ala.Cr.App.1982). Newspaper articles or widespread publicity, without more, are insufficient to grant a motion for change of venue. Anderson v. State, 362 So.2d 1296, 1298 (Ala.Cr.App. 1978). As the Supreme Court explained in Irvin v. Dowd, 366 U.S. 717, 723 [81 S.Ct. 1639, 1642-43, 6 L.Ed.2d 751] ... (1961):
"`To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court....'
"The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. Murphy v. Florida, 421 U.S. 794, 799-800 [95 S.Ct. 2031, 2035-2036, 44 L.Ed.2d 589] ... (1975). Thus, `[t]he proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.' Anderson v. State, 362 So.2d 1296, 1299 (Ala.Cr.App.1978)."
The trial court held a pretrial hearing on the appellant's motion for a change of venue. In support of his motion, the appellant presented evidence that tended to show that the local media had publicized both the crimes and the trial. That evidence is in the form of testimony by local citizens who testified that they recalled, on average, three or four television reports and six to eight newspaper articles on this subject. In attempting to show that this media coverage was prejudicial, the appellant offered the results of a telephone poll into evidence.[14] The state objected to the admission of the poll, and the trial court reserved ruling on the poll's admissibility. The appellant did not subsequently offer the poll into evidence, and there is no indication in the record that the poll results were ever submitted for the trial court's consideration.
During jury selection, the trial court conducted an individual voir dire examination of each veniremember. Each potential juror *481 was asked whether he or she had heard anything about the crime, and if so, whether that potential juror had developed any opinion regarding the guilt or innocence of the appellant. The venire consisted of 49 people. Twenty-three veniremembers had no recollection of the crimes, 21 veniremembers vaguely recalled hearing of the crimes, but could not remember any details, and only 5 veniremembers recalled hearing of the crimes in any detail. Three of these five veniremembers were excused for cause. Among those three excused were the only two veniremembers who had stated that they had an opinion as to the appellant's guilt or innocence.
The appellant has offered no evidence to show that the media coverage of this crime was prejudicial. See Anderson v. State, 362 So.2d 1296 (Ala.Cr.App.1978). Furthermore, the jury voir dire shows overwhelmingly that the jury was not prejudiced against the appellant. "Considering the answers of each prospective juror on voir dire examination we believe that the jury was impartial and adhered to its sworn duty to base its verdict upon the evidence adduced and the law as expounded by the court's instruction." Id., at 1300.
The appellant also contends in a footnote to his brief that the trial court erred in denying his requested funding for a professional pollster to determine the impact of the media coverage on the community. The appellant presented insufficient evidence to warrant the trial court's granting of this motion. Given this poor showing, the trial court did not abuse its discretion in denying the motion.

XXIV.
The appellant contends that he was subjected to double jeopardy because the trial court continued his second transfer hearing for nine days. Pursuant to directions from the Alabama Supreme Court, the order transferring the appellant to the circuit court to be tried as an adult was reversed and remanded to the trial court for another transfer hearing. Ex parte W.T.K., 586 So.2d 850 (Ala.1991). The Alabama Supreme Court held that, although the juvenile had voluntarily waived his rights and had confessed to the crimes and did not object to the use of the confession at the transfer hearing on the ground of violation of the privilege against self-incrimination, the confession would not be admissible at the transfer hearing if it was the product of an illegal arrest. The court set aside the transfer order and remanded the case for a determination of the lawfulness of his arrest. At the commencement of the second transfer hearing, the state attempted to introduce the entire transcript of the original transfer hearing; however, the trial court informed the state that there would be a new transfer hearing and continued the case for nine days in order for the state to obtain witnesses. The second hearing was held in compliance with the Supreme Court's instructions, and an order was entered transferring the appellant again to the circuit court to be tried as an adult. The appellant previously raised this issue on appeal to this court, and we held that there was no double jeopardy issue. W.T.K. v. State, 598 So.2d 33 (Ala.Cr.App.1992). This issue, having previously been decided by this court, is now res judicata.

XXV.
The appellant complains that the prosecution improperly struck 5 of 11 blacks from the jury venire in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). We do not agree. Although the trial court made a finding that there was no prima facie case of racial discrimination by the state in its striking of the veniremembers, it nevertheless required the prosecution to explain its reasons for striking them; thus we must review those reasons to determine if the state exercised its strikes in a racially discriminatory manner. Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); Huntley v. State, 627 So.2d 1013 (Ala.1992).
The prosecution gave the following reasons for striking the 5 veniremembers numbered 1, 9, 53, 98, and 128A:
Veniremember 1 was struck because, although he expressed no clear belief concerning *482 the death penalty, he is a member of a church that opposes the death penalty. In addition, both the veniremember and his mother have been represented by defense counsel. Further, as the prosecution stated, it appeared that this veniremember had difficulty understanding the questions being asked of him.
Veniremember 9 was struck because she responded that she could not under any circumstances vote for the death penalty. (The state's challenge for cause on this basis had been denied by the trial court.)
Veniremember 53 was struck because of her history of criminal charges and because of her responses concerning the death penalty. She also appeared extremely nervous during voir dire.
Veniremember 98 was struck because of her extensive criminal record, which she admitted in part and denied in part. In addition, her first cousin has been convicted of drug charges in Montgomery County, she is unemployed, and she gave conflicting responses regarding the death penalty.
Veniremember 128A was struck because of her responses regarding the death penalty: she stated that she does not know if there are any circumstances in which she could vote for the death penalty and that she could only make that decision when the time came. (The trial court denied the state's challenge for cause of this veniremember.) Further, the veniremember stated that she has a problem with her nerves, that she has taken medication for this problem in the past, and that her condition might affect her ability to sit on the jury. Finally, this veniremember served on a previous jury that found a defendant not guilty.
We have examined the record of the voir dire and find that these explanations are supported by the record.
Clearly, the prosecutor gave at least one race-neutral reason for striking each of the above veniremembers. See Naismith v. State, 615 So.2d 1323, 1325 (Ala.Cr.App.1993) ("A veniremember's involvement in or connection with criminal activity may serve as a race-neutral reason for the strike of that veniremember."); Childers v. State, 607 So.2d 350 (Ala.Cr.App.1992) (that the veniremember previously served on a jury that returned a not guilty verdict is a race-neutral reason); Kelley v. State, 602 So.2d 473, 476 (Ala.Cr.App.1992) ("A veniremember's indication that the member might have problems being on the jury in the case is a race-neutral reason for removing that person from the venire."); Fisher v. State, 587 So.2d 1027, 1036 (Ala.Cr.App.), cert. denied, 587 So.2d 1039 (Ala.1991), cert. denied, 503 U.S. 941, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992) ("Although a juror's reservations about the death penalty may not be sufficient for a challenge for cause, his view may constitute a reasonable explanation for the exercise of a peremptory strike."); Ward v. State, 539 So.2d 407 (Ala.Cr.App.1988) (that the veniremember or a member of his family had been represented by defense counsel is a race-neutral reason).

XXVI.
The appellant contends that it was error for the trial court, over his objection, to consolidate for trial the seven indictments against him. He asserts that the evidence of his escape from the Department of Youth Services and of the thefts and burglaries committed on the day of the capital offenses constituted inadmissible "collateral-crimes evidence." We find no merit to this contention. The indictments were properly consolidated for trial pursuant to Ala.R.Cr.P. 13.3(a)(1), (2), and (3) and 13.3(c), because the offenses were of the same or similar character, were connected in their commission, and were part of a common scheme or plan.

XXVII.
In accordance with Ala.R.App.P. 45A, we have examined the record in this case for any plain error, whether or not brought to our attention or to the attention of the trial court. We have found no "plain error or defect in the proceedings," either in the guilt phase or in the sentencing phases of the trial. We have also reviewed the cumulative effect of all separate errors and find that even when considered cumulatively, they do not call for reversal.
*483 We have also reviewed the appellant's sentence pursuant to ง 13A-5-53, which requires that, in addition to reviewing for any error involving the capital convictions, we shall also review the propriety of the death sentence. This review shall include a determination of the following: (1) whether any error adversely affecting the rights of the appellant was made in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in the case. Section 13A-5-53(b) requires that, in determining whether death is the proper sentence, we must determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the appellant.
After the appellant was convicted of the capital offenses charged, a separate sentence hearing was held before the jury in accordance with งง 13A-5-45 and -46. After hearing evidence concerning aggravating and mitigating circumstances, after being properly instructed by the trial court as to the applicable law, and after being correctly advised as to its function in finding aggravating and mitigating circumstances, in the weighing of those circumstances, if appropriate, and in its responsibility in reference to the return of an advisory verdict; the jury, by a vote of nine to three, returned the following verdict: "We the jury recommend that the defendant, William Thomas Knotts, be punished by life imprisonment without parole."
Thereafter, the trial court held another hearing in accordance with ง 13A-5-47, to determine whether it would sentence the appellant to death or adopt the jury's recommendation and sentence him to life imprisonment without the possibility of parole. The trial court ordered and received a written presentence investigation report, as required by ง 13A-5-47(b). After the hearing, the trial court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in ง 13A-5-49 and the existence or nonexistence of any mitigating circumstances in ง 13A-5-51 and ง 13A-5-52, as well as written findings of fact summarizing the crimes and the appellant's participation in them. In its findings of fact, the trial court found the existence of the following aggravating circumstances: (1) that the capital offenses were committed while the defendant was engaged in the commission of or attempted commission of a burglary and a robbery, งง 13A-5-49(2) and (4); and (2) that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses, ง 13A-5-49(8). The trial court examined the evidence of statutory mitigating circumstances, pursuant to ง 13A-5-51, and found the existence of two: (1) that the appellant has no significant history of prior criminal activity, ง 13A-5-51(1); and (2) that the appellant was 17 years and 11 months old at the time of the commission of the crimes, ง 13A-5-51(7). The trial court examined the evidence of nonstatutory mitigating circumstances, pursuant to ง 13A-5-52, and found the existence of three: (1) that the appellant comes from a dysfunctional family with an alcoholic, abusive father and that this background had a severe effect on him; (2) that he is impulsive and immature for his age, and he never learned to adequately control his emotions; and (3) that his entry into the state juvenile system began as a runaway from a dysfunctional home and not because of delinquent acts.
Thus, the trial court found the existence of two aggravating circumstances and five mitigating circumstances. It considered the presentence report along with the advisory verdict of the jury and weighed the aggravating circumstances against the mitigating circumstances, and finding that the aggravating circumstances outweighed the mitigating circumstances, sentenced the appellant to death.
The appellant was convicted of the offenses of murder committed during a burglary in the first degree, ง 13A-5-40(a)(4), and murder committed during a robbery in the first *484 degree, ง 13A-5-40(a)(2). These offenses are defined by statute as capital offenses. We take judicial notice that similar crimes are being punished capitally throughout this state. See, e.g., Ford v. State, 515 So.2d 34 (Ala.Cr.App.1986), aff'd, 515 So.2d 48 (Ala. 1987), cert. denied, 484 U.S. 1079, 108 S.Ct. 1061, 98 L.Ed.2d 1023 (1988); Kennedy v. State, 472 So.2d 1092 (Ala.Cr.App.1984), aff'd, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985). See also Hallford v. State, 548 So.2d 526 (Ala.Cr.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989); Cochran v. State, 500 So.2d 1161 (Ala.Cr.App.1984), aff'd in part, rev'd in part, 500 So.2d 1179 (Ala. 1985), aff'd on return to remand, 500 So.2d 1188 (Ala.Cr.App.), aff'd, 500 So.2d 1064 (Ala. 1986), cert. denied, 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 537 (1987).
The facts of this case are undisputed, and the evidence of guilt of the offenses charged in all the indictments, including the capital murder indictments, is overwhelming. The evidence is such that the jury had no choice except to find the defendant guilty on all charges. The jury clearly was not influenced by passion or prejudice, because, in spite of the evidence clearly warranting the imposition of the death penalty, it returned a recommendation of life imprisonment without the possibility parole.
We have carefully searched the record of the guilt and the sentence phases of the appellant's trial, and we have found no error warranting reversal. In reviewing the sentence, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. We find that the sentencing findings and conclusions of the trial court are supported by the evidence. We concur in the judgment of the trial court that death is the appropriate sentence in this case. Our independent weighing of the aggravating circumstances and mitigating circumstances convinces us that the sentence of death is appropriate for this appellant. Considering the crimes committed and the appellant, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
Accordingly, the appellant's capital convictions and sentence of death are due to be, and they are hereby, affirmed; his conviction and sentence for escape in the third degree are affirmed; and his conviction and sentence for theft of property in the second degree (CC-91-2532) are affirmed. In accordance with our holding in part VII of this opinion, we remand for appropriate action the following cases: burglary in the third degree (CC-91-2533), theft of property in the first degree (CC-91-2534), burglary in the first degree (91-2535), and theft of property in the second degree (91-2536). The trial court should file a return to remand with this court within 45 days from the date of the release of this opinion.
AFFIRMED IN PART; REMANDED FOR PROPER SENTENCING.
All Judges concur.
NOTES
[1] The offenses from which these indictments arise occurred on October 18, 1989, when the appellant was a 17-year-old juvenile. He was arrested on October 19, 1989, and six petitions were filed against him, charging him with the offenses. The state moved the juvenile court to transfer him to circuit court for prosecution as an adult. On November 27, 1989, after a transfer hearing, the juvenile court transferred the appellant to the circuit court for prosecution as an adult on all charges. He appealed.

At the February 1990 term of the Montgomery County Grand Jury, the appellant was indicted on the charges (CC-90-436 through CC-90-442), and he entered pleas of not guilty on February 21, 1990. On May 25, 1990, this court affirmed the transfer order; however, the Alabama Supreme Court, on April 19, 1991, reversed the judgment and remanded the case for further proceedings. Ex parte W.T.K., 586 So.2d 850 (Ala.1991).
On October 17, 1991, a second transfer hearing was held, and the appellant was again transferred, by order of the juvenile court, to the circuit court to stand trial as an adult. On appeal, this transfer was affirmed. W.T.K. v. State, 598 So.2d 33 (Ala.Cr.App.), cert. denied, 506 U.S. 859, 113 S.Ct. 173, 121 L.Ed.2d 120 (1992). Meanwhile, the appellant was reindicted on the charges (CC-91-2531 through CC-91-2537).
[2] The pertinent portion of the indictment reads, "William Thomas Knotts ... did escape or attempt to escape from custody, to-wit: Department of Youth Services, in violation of Section 13A-10-33 of the Code of Alabama."
[3] The pertinent portion of the indictment reads, "William Thomas Knotts ... did knowingly obtain or exert unauthorized control over a bicycle... of the value of $105.00, the property of Delbert Parker, with the intent to deprive the owner of the property, in violation of Section 13A-8-4."
[4] The pertinent portion of the indictment reads, "William Thomas Knotts ... did knowingly enter or remain unlawfully in a building of Carrie Ware, with intent to commit a crime therein, theft of property, in violation of Section 13A-7-7."
[5] The pertinent portion of the indictment reads, "William Thomas Knotts, did knowingly obtain or exert unauthorized control over a revolver, jewelry, a sweater, food, a crown [automobile air freshener], and credit cards, to-wit: Parisian, Sears, Lowe's, Exxon, Gulf, Silver Card ... of the value of $1,450.00, the property of Carrie Ware, with intent to deprive the owner of the property, in violation of Section 13A-8-3."
[6] The pertinent portion of the indictment reads, "William Thomas Knotts ... did knowingly and unlawfully enter or remain unlawfully in a dwelling of Shelia Rhodes, with intent to commit a crime therein, Theft of Property, and in effecting entry or while in the dwelling or in immediate flight therefrom, said defendant was armed with... a deadly weapon, a gun, in violation of Section 13A-7-5."
[7] The pertinent portion of the indictment reads, "William Thomas Knotts ... did knowingly obtain or exert unauthorized control over a derringer, a trash bag, three revolvers, a purse, lawful coinage of the United States of America, a flashlight, food, a camera, clothing, clip and rounds, and bullets ... of the aggregate value of $537.50, the property of Shelia Rhodes, with intent to deprive the owner of the property, in violation of Section 13A-8-4."
[8] Count I of the indictment reads as follows:

"William Thomas Knotts ... did intentionally cause the death of Helen Rhodes by shooting her with a gun and William Knotts ... caused said death during the time that William Knotts... was in the course of committing a theft of a 1989 Toyota Corolla, jewelry, shoes, clothing and bags, better descriptions of which are unknown to the Grand Jury, of the aggregate value of $16,000.00, the property of Helen Rhodes, by the use of force against the person of Helen Rhodes, with intent to overcome her physical resistance or physical power of resistance, while the said William Knotts ... was armed with a deadly weapon or dangerous instrument, to-wit: a gun, a better description of which is unknown to the Grand Jury, or while the said William Knotts ... caused serious physical injury to Helen Rhodes, in violation of Section 13A-5-40."
Count II of the indictment reads as follows:
"William Thomas Knotts ... did intentionally cause the death of Helen Rhodes by shooting her with a gun and he caused the death during the time that he knowingly and unlawfully entered or remained unlawfully in the dwelling of Helen Rhodes with intent to commit the crime of Murder, Robbery, and/or Theft of Property therein, and while effecting entry or while in the dwelling or in immediate flight therefrom, he was armed with a deadly weapon, a gun, or caused physical injury to Helen Rhodes, or used or threatened the imminent use of a dangerous instrument, a gun, in violation of Section 13A-5-40."
[9] "The decision of the jury to return an advisory verdict recommending a sentence of life imprisonment without the possibility of parole must be based on a vote of a majority of the jurors. The decision of the jury to recommend a sentence of death must be based on a vote of at least 10 jurors." Ala.Code 1975, ง 13A-5-46(f).
[10] We sometimes refer to Helen Rhodes, the murder victim in this case, as "the victim," although there were other victims.
[11] Ala.R.Cr.P. 29 states, in pertinent part,

"Clerical mistakes in judgments, orders, or other parts of the record, and errors arising from oversight or omission may be corrected by the court at anytime of its own initiative or on the motion of any party and after such notice, if any, as the court orders. During the pendency of an appeal or thereafter, such mistakes may be so corrected by the trial court."
[12] The trial court also made the following findings:

"D. Knotts hid and shot Mrs. Rhodes in her own home, knowing all the time she was unaware of his presence and completely defenseless and helpless."
"F. Mrs. Rhodes was unaware of and did not realize Knotts's intent to kill her when he pursued her from the den as she struggled toward her son."
Upon our independent review, we cannot agree that the evidence supports these findings. In regard to "D," by the appellant's confession, we conclude that the victim was well aware of the appellant's presence after he first shot her. In regard to "F," her struggle toward her son indicates that she knew of the intruder's intent to kill or at least of the grave danger of the intruder's presence and his pointing a deadly weapon at her. The trial court's conclusion cannot be reasonably supported by the evidence; rather, it is contrary to the facts.
[13] Subsection (2) states: "A not guilty verdict as to one or more counts or defendants in the charge shall not invalidate a guilty verdict as to any other count or defendant in the charge."
[14] This poll was an informal telephone survey of 100 residents of Montgomery County, whose names were picked at random from the telephone book. The pollster did not ascertain whether the poll's respondents were eligible for jury service, and the pollster did not have an opinion regarding the accuracy of the poll. The poll's results are contained in the record. We note that most of the poll's respondents had heard of the crime and had not developed an opinion regarding the appellant's guilt or innocence. Although 28% of the poll's respondents stated that they had developed an opinion of the appellant's guilt, the pollster did not ask them whether they would be able to set this opinion aside and weigh the evidence fairly if they were called to serve on the jury.